**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

WILLIAM HOWARD ADKINS and
MARRIAN A. ADKINS,

Plaintiffs,

v. CIVIL ACTION NO. 3:13-32123

CMH HOMES INC. d/b/a FREEDOM HOMES
VANDERBILT MORTGAGE AND FINANCE
and JOHN DOE HOLDER,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is the Motion to Dismiss of Defendants CMH Homes and Vanderbilt Mortgage, ECF No. 6. For the reasons stated below, this Motion is **DENIED in part**, and the Court **RESERVES** judgment **in part**. Specifically, the Court **DENIES** Defendants' motion to dismiss Counts I and II, and it **RESERVES** judgment regarding Defendants' motion to dismiss Count III.

The Court **DIRECTS** Plaintiffs to file, within 14 days of the entry of this Memorandum Opinion and Order, an Amended Complaint setting out in greater detail the facts supporting Count III. Such Amended Complaint shall be identical to the existing Complaint in all other respects. Within 14 days of the filing of the Amended Complaint, the Court **DIRECTS** Defendants to file a Supplemental Memorandum to their Motion to Dismiss, if they wish to persist in their motion to dismiss Count III. Plaintiffs may file a Supplemental Response to such Memorandum within 7 days of Defendants' filing.

## I. Background

In November 2013, Plaintiffs William Howard Adkins and Marrian A. Adkins filed the instant action in the Circuit Court of Cabell County, West Virginia, against Defendants CMH Homes, Inc., doing business as Freedom Homes, ("CMH Homes"), Vanderbilt Mortgage and Finance ("Vanderbilt Mortgage"), and John Doe Holder, regarding the purchase, financing, and warranty of a mobile home that they bought from CMH Homes in 2009. According to the Complaint, CMH Homes sold the mobile home to Plaintiffs, Vanderbilt Mortgage services the loan which resulted from the sale,[1] and John Doe Holder is the as-yet unidentified holder of the note for that loan. *See* Compl. ¶¶ 3-5, ECF No. 1-1. Also per the Complaint, Plaintiffs are unsophisticated consumers with limited educational backgrounds; Mr. Adkins is unemployed, and Mrs. Adkins is disabled. *Id.* ¶¶ 2, 23(a).

The Complaint lays out the following pertinent facts: In or about April 2009, Plaintiffs visited the sales lot of CMH Homes, selected a mobile home they liked, and were told by David Fry—an agent of CMH Homes—that the price for the home, including set-up fees, would be approximately $92,000. *Id.* ¶ 6. Plaintiffs then informed Mr. Fry that they could not commit to buying the home because they were concerned about their ability to make payments on such a large purchase. *Id.* ¶ 7. Several days later, Plaintiffs received a call from Mr. Fry, who told them that CMH Homes would give them a deal through which they could purchase the home without a down payment. *Id.* ¶ 8. They then returned to the lot and met with Mr. Fry. *Id.* ¶ 9(a). During this meeting, Mr. Fry told Plaintiffs that they had qualified for financing with a 2.9% interest rate, that the home would come with a one-year warranty, and after Plaintiffs expressed hesitation, that they would have to purchase a home quickly if they wanted a 30-year repayment period because, after

[1] The Complaint also asserts that Vanderbilt Mortgage is the "assignee" of CMH Homes, but given the addition of John Doe Holder as a defendant in this case, any role of Vanderbilt Mortgage beyond servicing Plaintiffs' loan is unclear. *See* Compl. ¶ 4.

that year, CMH Homes would only offer 10-year repayment plans. *Id.* ¶ 9(b)-(d). Plaintiffs agreed to purchase a mobile home from CMH Homes at a 2.9% interest rate over a 30-year repayment period, signing a document Mr. Fry gave to them without ever being given a copy. *See id.* ¶ 9(e). Apparently thinking that they could still shop for the specific mobile home they wanted, Plaintiffs inquired as to whether they could look at other homes at a nearby dealership which was also owned by CMH Homes. *See id.* ¶ 9(f). At that point, Mr. Fry informed them that they were already "locked in" to the specific home that they had just agreed to purchase. *Id.* Plaintiffs were given no documentation regarding the terms of the purchase at that time. *See id.* ¶ 9(g).

In or about late April 2009, Plaintiffs were informed by Mr. Fry that the new home would not be placed on their lot facing the main road like all of their neighbors' homes and like their current home; instead, it would face a dirt road on the side of their property. *Id.* ¶ 10(a)-(c). Plaintiffs objected to such placement because it would require the relocation of their power line and pole at a cost of $5,000 to Plaintiffs. *Id.* ¶ 10(c)-(d). When Plaintiffs informed Mr. Fry that they could not afford this, he told them that they no longer qualified for the special 2.9% interest rate and that, instead, their interest rate would be approximately 5%. *Id.* ¶ 10(e). Mr. Fry then personally inspected Plaintiffs' land and told Plaintiffs that, because of their site, the interest rate would actually be closer to 6%. *Id.* ¶ 11.

On or about May 19, 2009, just before the scheduled signing by Plaintiffs of the closing documents, Mr. Fry informed them that 1) "something had come up" so their interest rate had risen another couple of points but 2) after set-up, their mobile home would be worth at least $155,000. *See id.* ¶¶ 12-13. In reliance on this promise, Plaintiffs signed the documents despite the fact that no one explained the content of the documents to Plaintiffs; instead, agents of CMH Homes merely pointed out to Plaintiffs where they needed to sign. *See id.* ¶ 15. The actual purchase price charged

of Plaintiffs was $113,300, and the amount financed totaled $136,498.21, including over $11,000 in settlement charges and a discount fee of $5,239.74, which was never explained to Plaintiffs and which they never requested. *Id.* ¶¶ 16-17. The final interest rate was 8.49%. *Id.* ¶ 27(a). About six months later, a contractor who had previously performed work on Plaintiffs' new mobile home under its warranty informed them that their warranty had been terminated, so no further work would be performed on the home. *Id.* ¶ 19.

Based upon these allegations, Plaintiffs make the following legal claims: Unconscionable Inducement (Count I), "Fraud as a Contract Defense" (Count II), and Joint Venture (Count III). Under Count I, Plaintiffs request 1) a declaration that Plaintiffs' financing is unenforceable pursuant to West Virginia Code § 46A-2-121(1), 2) actual damages "equivalent to the amount paid plus [the] amount claimed due under the financing agreement", 3) incidental and consequential damages, 4) civil penalties and reasonable attorneys' fees and costs pursuant to West Virginia Code § 46A-5-101(1) and -106,[2] and 5) such other relief as the Court may deem equitable and just. *Id.* ¶ 24. Under Count II, Plaintiffs request 1) a "[s]et off or other appropriate equitable relief enjoining the enforcement of the contract," 2) reasonable attorneys' fees and costs, and 3) such other relief as the Court may deem appropriate and just. *Id.* ¶ 31. Under Count III, Plaintiffs request that this Court declare Defendants jointly and severally liable. *Id.* at 9.

CMH Homes and Vanderbilt Mortgage (hereinafter, "Defendants") removed the action to this Court in December 2013. In lieu of filing an answer, Defendants filed the instant Motion to Dismiss. Plaintiffs filed their Response, ECF No. 10, and Defendants filed their Reply, ECF No. 11. This Motion is now ripe for resolution.

---

[2] Despite purporting to request attorneys' fees and costs under § 46A-5-106, a provision regarding the adjustment of damages for inflation, it is apparent to this Court that Plaintiffs intend to request such fees and costs under § 46A-5-104, which authorizes such an award.

## II. Standard

When considering a motion to dismiss, 1) a court should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then 2) "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

For the first step, the complaint must provide the plaintiff's "grounds of . . . entitlement to relief" in more factual detail than mere "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). "[A] formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679.

For the second step, a court must take the factual allegations in the complaint as true, and the complaint must be viewed in the light most favorable to the plaintiff. *See Twombly*, 550 U.S. at 555-56. The complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 555, 570 (internal quotation marks omitted). Plausibility is established "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).

## III. Count I: Unconscionable Inducement

Defendants argue that, under West Virginia law, Plaintiffs' unconscionable inducement claim must be dismissed because Plaintiffs fail to allege sufficient facts in support of both

procedural and substantive unconscionability to plausibly give rise to an entitlement to relief. Plaintiffs respond that only sufficient facts supporting *either* procedural *or* substantive unconscionability need to be alleged to plausibly give rise to an entitlement to relief under West Virginia Code § 46A-2-121, and regardless, they have sufficiently alleged both types of unconscionability.

Though the Complaint references West Virginia Code § 46A-2-121, it only does so in the context of one of the five different types of relief requested under Count I. *See* Compl. ¶ 24(a)-(e). Nowhere in the general portion of this unconscionable inducement count do Plaintiffs explicitly limit themselves to bringing this claim only under § 46A-2-121; to the contrary, based upon the many different types of relief requested, it appears that Plaintiffs assert this claim under both § 46A-2-121 and common law unconscionability.[3] *See id.* Additionally, it does not appear that § 46A-2-121 in any way alters a court's analysis of common law unconscionability claims. *See New v. GameStop, Inc.*, 753 S.E.2d 62, 74-79 (W. Va. 2013). Further, despite the disjunctive wording used in § 46A-2-121,[4] it is unclear from the West Virginia Supreme Court of Appeals'

---

[3] Defendants initially argue that "unconscionable inducement"—as Plaintiffs title Count I—does not exist under West Virginia law. *See* Mem. Supp. Defs.' Mot. Dismiss 3, ECF No. 7; *Staats v. Bank of America,* No. 3:10-CV-68 (N.D. W. Va. Nov. 4, 2010) ("[T]he Court is aware of [no authority] for the proposition that West Virginia law recognizes a common law cause of action for unconscionable inducement. In fact, the case law appears to weigh toward the opposite conclusion. . . . [P]laintiffs may assert *unconscionability* claims under § 46A-2-121 of the [West Virginia Consumer Credit and Protection Act]. Under that section, a court may refuse to enforce a loan agreement if the agreement was induced by unconscionable conduct." (citation omitted) (internal quotation marks omitted)). Given that "unconscionable inducement" is a near-perfect synonym for procedural unconscionability and given that the facts alleged and arguments made under this Count in the Complaint apply perfectly to the unconscionability analyses under both West Virginia's common law and § 46A-2-121, the Court ascribes no particular importance to the title of "unconscionable inducement" and, instead, treats this claim as one generally alleging unconscionability. *See* Compl. ¶ 24 ("The consumer credit transaction was unconscionable, under all circumstances alleged, at the time it was made[, i.e., it was substantively unconscionable,] and/or was induced by unconscionable conduct[, i.e., it was procedurally unconscionable], and therefore was unenforceable."). The parties also appear to treat this claim as simply an unconscionability claim. *See* Mem. Supp. Defs.' Mot. Dismiss 4-8, Pls.' Resp. 4-9; Defs.' Reply 1-3.

[4] West Virginia Code § 46A-2-121(1) states:

> With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:
> (a) The agreement or transaction to have been unconscionable at the time it was made, *or* to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or
> (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was

analysis of unconscionability under § 46A-2-121 whether that court interprets § 46A-2-121 to truly require that a plaintiff only prove *either* procedural *or* substantive unconscionability. *See, e.g.*, *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 656-59 (W. Va. 2012). At this time, the Court will apply the common law unconscionability analysis—which likely sets a higher burden on Plaintiffs than the analysis under § 46A-2-121—to Plaintiffs' unconscionable inducement claim. Thus, the entirety of this claim will be tested under Defendants' Motion to Dismiss at the higher standard.

Under West Virginia common law, an unconscionable contract claim must demonstrate, at least to some extent, two types of unconscionability: procedural and substantive. *See State ex rel. Johnson Controls, Inc. v. Tucker*, 729 S.E.2d 808, 817 (W. Va. 2012). However, the showing required for each of these two types of unconscionability is flexible:

> [Procedural and substantive unconscionability] need not be present to the same degree. Courts should apply a "sliding scale" in making this determination: the more substantively oppressive [a] contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa.

*Id.* (internal quotation marks omitted). Both types of "unconscionability often occur together, and the line between the two concepts is often blurred." *Brown ex rel. Brown v. Genesis Healthcare Corp.* ("*Brown I*"), 724 S.E.2d 250, 288 (W. Va. 2011), *vacated on other grounds sub nom. Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1204 (2012). "The particular facts involved in each case are of utmost importance since certain conduct, contracts or contractual provisions may be unconscionable in some situations but not in others." *Brown v. Genesis*

---

> made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so limit the application of any unconscionable term or part as to avoid any unconscionable result.

W. Va. Code § 46A-2-121(1) (emphasis added).

*Healthcare Corp.* ("*Brown II"*), 729 S.E.2d 217, 227 (W. Va. 2012) (internal quotation marks omitted).

"Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract." *Tucker*, 729 S.E.2d at 817 (internal quotation marked omitted). Further,

> Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

*Id.* (internal quotation marks omitted).

"Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party." *Id.* (internal quotation marked omitted). Although no single, precise definition of substantive unconscionability exists "because the factors to be considered vary with the content of the agreement at issue," the general inquiry is whether "the terms of a contract are unreasonably favorable to the more powerful party." *See id.* (internal quotation marks omitted); *Brown I*, 724 S.E.2d at 288. In determining whether a contract is substantively unconscionable, courts consider factors such as "the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Tucker*, 729 S.E.2d at 817 (internal quotation marks omitted).

"[A]n analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole." *Pingley v. Perfection Plus Turbo-Dry, LLC*, 746 S.E.2d 544, Syl. Pt. 6 (W.

Va. 2013) (internal quotation marks omitted). Overall, "[a] determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and the existence of unfair terms in the contract." *Brown II*, 729 S.E.2d at Syl. Pt. 6 (internal quotation marks omitted).

Here, Plaintiffs allege that they were told by an agent of CMH Homes that the price for the mobile home they wanted, including set-up fees, would be approximately $92,000. They were also told that they had qualified for financing at a 2.9% interest rate over a 30-year repayment period, that they would owe no down payment, and that the home would come with a one-year warranty. With these promises in mind, Plaintiffs signed some paperwork, a copy of which they never received, and they were told that they were now "locked in" to purchasing that home.

Over the next month, the agent told Plaintiffs that they no longer qualified for the special 2.9% interest rate and that their rate had risen to approximately 5%, then closer to 6%, and finally, just before closing, another "couple of points." At the closing, no one explained the content of the documents to Plaintiffs; CMH Homes' agents merely pointed to where to sign, but Plaintiffs were told that their mobile home would be worth at least $155,000 once it was set up. The actual purchase price charged of Plaintiffs was $113,300—23% more than the $92,000 purchase price Plaintiffs accepted when they signed the first form. The total amount financed was $136,498.21—48% more than the $92,000 purchase price. This total financing amount included 1) over $11,000 in settlement charges—which Plaintiffs were told had been included in the original $92,000 price—and 2) a "discount fee" of $5,239.74—which was never explained to Plaintiffs and which they never requested. The final interest rate was 8.49%—almost three times the initial 2.9% interest rate they accepted when they signed the first form. Additionally, about six months later, Plaintiffs were informed that their warranty had been terminated.

The facts in this case, as alleged, present a compelling case of procedural unconscionability. Thus, the alleged facts supporting substantive unconscionability need not be as strong. Given the parties' relative positions and bargaining power and the allegation that CMH Homes repeatedly changed the terms of the deal to make it more beneficial to itself after Plaintiffs were supposedly "locked in" to the deal, the Court finds the final terms of the deal, including the purchase price, fees, and financing terms, to be sufficiently substantively unconscionable such that these alleged terms, together with the strong allegations of procedural unconscionability, plausibly give rise to an entitlement to relief. The Court thus **DENIES** Defendants' motion to dismiss Count I.

## IV. Count II: Fraud as a Contract Defense

Defendants argue, first, that Plaintiffs' fraud claims[5] are barred by West Virginia's two-year statute of limitations on such claims under West Virginia Code § 55-2-12, even if the discovery rule is applied. Second, Defendants argue that, to the extent Plaintiffs seek equitable relief under any of their fraud claims, such claims are still barred under laches.[6] Plaintiffs respond

[5] All parties refer to Plaintiffs' fraud "claim" in the singular, despite the fact that Plaintiffs make multiple fraud claims. To clarify, a "claim for relief" is different from a legal theory for why relief should be granted. Fraud is a legal theory; a material misrepresentation that a house is under warranty for a year when it, in fact, is not, together with justifiable reliance by the complainant and injury to the complainant as a result, is a claim. *Cf. NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 292 (7th Cir. 1992) ("Identifying legal theories [in the Complaint] may assist defendants and the court in seeing how the plaintiff hopes to prevail, but this organization does not track the idea of 'claim for relief' in the federal rules. Putting each legal theory in a separate count is a throwback to code pleading . . . [in which] legal theory and facts together created a 'cause of action.' The [Federal] Rules of Civil Procedure divorced factual from legal aspects of the claim and replaced 'cause of action' with 'claim for relief' to signify the difference. . . . One set of facts producing one injury creates one claim for relief, no matter how many laws the deeds violate.").

[6] In both their original Motion and their Reply, as part of the section entitled "Plaintiffs' fraud claim is time-barred," Defendants argue that Plaintiffs have only two possible remedies for the fraud allegedly perpetrated upon them: 1) they can affirm the contract and sue for damages, which is time-barred by the statute of limitations, or 2) they can "rescind" the contract and yet also be required to pay the remainder owed for the mobile home to Vanderbilt Mortgage. Defendants further argue that Plaintiffs have waived any right they may have had to demand rescission. In their Motion, Defendants provide no citation for their contention that Plaintiffs are faced with only these two possible remedies. In their Reply, they cite only a 92-year-old opinion as such authority. Defendants also argue that enjoining enforcement of the contract without requiring Plaintiffs to pay Vanderbilt Mortgage the outstanding loan balance would result in a de facto award of money damages, which is barred by the statute of limitations. They again provide no citation for this argument. *See CUMIS Ins. Soc., Inc. v. Raines*, No. CIV.A. 3:12-6277, 2013 WL 500305, at *2 (S.D. W. Va. Feb. 11, 2013) ("[G]enerally, money damages are a legal remedy. There are two exceptions, however.

that they seek only equitable relief under their fraud claims; thus, the statute of limitations does not apply. Further, they respond that these claims are not barred under laches.

Under Count II, Plaintiffs request 1) a "[s]et off or other appropriate equitable relief enjoining the enforcement of the contract," 2) reasonable attorneys' fees and costs, and 3) such other relief as the Court may deem appropriate and just. Compl. ¶ 31. Though it is unclear to the Court precisely how Plaintiffs request a "set off" in this context, Plaintiffs have clearly expressed in their Response their intent to request solely equitable relief under Count II, and the Complaint evinces this intent. *See Mellon-Stuart Co. v. Hall*, 359 S.E.2d 124, 134 (W. Va. 1987) ("It is well-settled in this State that where one party obtains a judgment against another, the judgment debtor may obtain a setoff in the amount of a valid and unsatisfied judgment he holds against the judgment creditor. . . . The doctrine is equitable in origin, and the right of a party to obtain a setoff is usually addressed to the sound discretion of the trial court."); *see also Patrick Henry Estates Homeowners Ass'n, Inc. v. Miller*, 758 F. Supp. 2d 331, 341 (N.D. W. Va. 2010) (holding that costs and attorneys' fees related to equitable claims also are equitable in nature). The Court thus finds Defendants' arguments regarding the statute of limitations normally applicable to a fraud claim to be inapplicable to Count II at this time. *See Laurie v. Thomas*, 294 S.E.2d 78, 81 (W. Va. 1982) ("Where a suit based on fraud is not seeking damages but seeks to rescind a writing or impose a trust or other equitable relief, it is not a common law action for fraud but is equitable in nature. . . . [Such a] case is one in equity and the doctrine of laches applies rather than any specific statute of limitations period."). The Court will now examine whether the doctrine of laches bars Plaintiffs' fraud claims, as also argued by Defendants.

---

Damages are equitable when they are: (1) restitutionary or (2) incidental to or intertwined with injunctive relief." (internal quotation marks omitted)). The Court need not resolve these issues for the purposes of this Motion to Dismiss, but if Defendants raise such arguments in the future, the Court expects Defendants to provide adequate supportive citations.

"Mere delay will not bar relief in equity on the ground of laches. Laches is a delay in the assertion of a known right which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right." *State, Dep't of Health & Human Res., Child Advocate Office on Behalf of Robert Michael B. v. Robert Morris N.*, 466 S.E.2d 827, 832 (W. Va. 1995) (internal quotation marks omitted). "Accordingly, the defense of laches is sustainable only on proof of two elements: (1) lack of diligence by the party against who[m] the defense is asserted[] and (2) prejudice to the party asserting the defense." *Id.* (internal quotation marks omitted). "The bare claim that something is 'manifestly unfair' or the mere existence of delay does not begin to meet the [defendant's] burden of proving either lack of diligence by the [plaintiff] or prejudice to the party asserting the defense, which is necessary in order to sustain the defense of laches." *Id.* at 833 (internal quotation marks omitted); *see also Province v. Province*, 473 S.E.2d 894, 904-05 (W. Va. 1996) ("[A court] will not . . . find[ a claim to be barred by laches] if the party asserting the defense fails to prove prejudice. The burden of proving unreasonable delay and prejudice is upon the litigant seeking relief. No rigid rule can be laid down as to what delay will constitute prejudice; every claim must depend upon its own circumstances. To be clear, the plea of laches cannot be sustained unless facts are alleged to show prejudice to the opposing party, or that the ascertainment of the truth is made more difficult by the delay in seeking immediate relief."). "Laches . . . may be applied where bonafide rights of third parties have intervened or where by virtue of some other event, it is inequitable to enforce the claim . . . ." *Laurie v. Thomas*, 294 S.E.2d 78, 82 (1982). As further clarified by the West Virginia Supreme Court of Appeals:

> Where a party knows his rights or is cognizant of his interest in a particular subject-matter, but takes no steps to enforce the same until the condition of the other party has, in good faith, become so changed, that he cannot be restored to his former state if the right be then enforced, delay becomes inequitable, and operates

> as an estoppel against the assertion of the right. This disadvantage may come from death of parties, loss of evidence, change of title or condition of the subject-matter, intervention of equities, or other causes. When a court of equity sees negligence on one side and injury therefrom on the other, it is a ground for denial of relief.

*Id.* (internal quotation marks omitted).

At this stage, the Court can find little support for Defendants' claim that Plaintiffs' equitable fraud claim is barred by laches. As would be expected at the motion to dismiss stage, where the facts alleged in the Complaint are taken as true and outside evidence is normally not to be considered by the Court, no prejudice or injury to Defendants sufficient to find Plaintiffs' equitable fraud claim barred by laches is evident in this case. The Court thus **DENIES** Defendants' motion to dismiss Count II.

## V. Count III: Joint Venture

Defendants argue that Plaintiffs' joint venture claim must be dismissed because Plaintiffs have only pled conclusory allegations in support of this claim. Plaintiffs respond that they have pled sufficient facts to state a claim for relief that is plausible on its face; however, in the alternative, they request leave to amend their Complaint.

Count III, despite being entitled merely "Joint Venture," alleges both joint venture and agency claims, so the Court will review the law applicable to both types of claims. *See* Compl. ¶¶ 33-38. Importantly, joint venturers are normally liable for each other's actions in their capacity as joint venturers, while in the agency context, agents are usually not liable for their actions in their capacity as agents, but principals are liable for such actions of the agent. *See Armor v. Lantz*, 535 S.E.2d 737, 743 (W. Va. 2000); *State ex rel. Clark v. Blue Cross Blue Shield of W. Va., Inc.*, 510 S.E.2d 764, 789 (W. Va. 1998). Thus, a properly pleaded joint venture or agency claim should contain facts adequately alleging both the necessary relationship, itself,—joint venture or agency—and at least one underlying claim—fraud, unconscionability, etc.—based upon the

actions of at least one of the parties to the relationship. *See Proffitt v. Greenlight Fin. Servs.*, No. CIV.A. 2:09-1180, 2011 WL 1485576, at *4 (S.D. W. Va. Apr. 19, 2011). Here, Defendants challenge only the adequacy of the alleged facts supporting the necessary relationships between Defendants, such that liability for the actions of one defendant may be applied vicariously to the other defendants.

"Whether or not a joint venture exists is normally a question to be answered by the trier of fact." *Armor*, 535 S.E.2d at 743. As defined by the West Virginia Supreme Court of Appeals,

> A joint venture . . . is an association of two or more persons [or entities] to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied.

*Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*, 737 S.E.2d 270, Syl. Pt. 10 (W. Va. 2012) (internal quotation marks omitted). Further,

> [I]ntrinsic to a joint venture, is the concept of mutual efforts to promote the business, the success of which would accrue to the benefit of all parties: To constitute a joint adventure the parties must combine their property, money, efforts, skill, or knowledge, in some common undertaking of a special or particular nature, but the contributions of the respective parties need not be equal or of the same character. There must, however, be some contribution by each party of something promotive of the enterprise.

*Id.* at 281 (internal quotation marks omitted). "An agreement, express or implied, for the sharing of profits is generally considered essential to the creation of a joint []venture . . . ." *Armor*, 535 S.E.2d at 743 (internal quotation marks omitted) (declining to find a joint venture between local and visiting counsel, in part because the fee agreement involved only the payment of a flat fee from the latter to the former). Joint venturers should also have "equal control over the common commercial pursuit," though "the control required . . . is not actual physical control, but the legal right to control the conduct of the other with respect to the prosecution of the common purpose." *Id.* at 746

(internal quotation marks omitted). Importantly, "members of a joint venture are . . . jointly and severally liable for all obligations pertaining to the venture, and the actions of the joint venture bind the individual co-venturers." *Id.* at 743.

An agent, on the other hand, "is a representative of his principal in business or [in] contractual relations with third persons." *Harper v. Jackson Hewitt, Inc.*, 706 S.E.2d 63, 75 (W. Va. 2010) (internal quotation marks omitted). "Since an agent acts for his principal in a representative capacity, the principal, rather than the agent, is ordinarily bound by contracts entered into on his behalf by his agent when the making of such contracts is within the scope of the agent's actual or apparent authority." *State ex rel. Clark*, 510 S.E.2d at 789 (internal quotation marks omitted). "One of the essential elements of an agency relationship is the existence of some degree of control by the principal over the conduct and activities of the agent." *Harper*, 706 S.E.2d at 75 (internal quotation marks omitted).

"[T]he burden of proving an agency [relationship] rests upon him who alleges the existence of the agency." *All Med, LLC. v. Randolph Eng'g Co., Inc.*, 723 S.E.2d 864, 871 (W. Va. 2012). However, once a prima facie showing of the agency relationship has been made, "a principal denying agency must show that the principal neither controlled, nor had the right to control, the [alleged agent's] work . . . ." *Harper*, 706 S.E.2d at 76; *see Sanders v. Georgia-Pac. Corp.*, 225 S.E.2d 218, 222 (W. Va. 1976) ("It is always incumbent upon one who asserts vicarious liability to make a prima facie showing of the existence of the relation of . . . principal and agent . . . . However, once a prima facie showing has been made, it is incumbent upon one who would defeat liability on the basis of an independent contractor relationship to show such fact.").

"[O]ne must examine the facts of a particular case to determine whether an agency relationship exists." *Harper*, 706 S.E.2d at 75 (internal quotation marks omitted). "[P]roof of an

express contract of agency is not essential to the establishment of the relation. It may be inferred from facts and circumstances, including conduct." *Id.* (internal quotation marks omitted). "[W]here [a] factual conflict exists regarding the degree of control exercised and the nature of the relationship thereby created, jury resolution is warranted." *Id.* at 76 (internal quotation marks omitted).

In their Complaint, Plaintiffs allege that 1) all Defendants "had an agreement, either written, oral, constructive, or otherwise [sic] for a single business enterprise, that is the closing of the sale and financing of the home at issue in this case," 2) all Defendants "shared in the profits and/or losses of the single business enterprise," 3) all Defendants "combined their money, skill, and/or knowledge to carry out this single business enterprise," and 4) each act of all Defendants was "pursued with a joint purpose"—that is, the "furtherance of a joint venture." *See* Compl. ¶¶ 33-36. Plaintiffs also assert that 1) CMH Homes and John Doe Holder "exercised a degree of control over the remaining [d]efendants [sic] in carrying out the single business enterprise," 2) the acts of Vanderbilt Mortgage were "done on behalf of" John Doe Holder, and 3) the acts of all Defendants were conducted as part of the principal-agency relationship between Defendants. *See id.* ¶¶ 37-38. Plaintiffs further allege that Vanderbilt Mortgage is the "assignee" of CMH Homes, though any details regarding this assignment are lacking. *Id.* ¶ 4.

The Court is troubled by the lack of factual detail provided in support of the joint venture and agency claims asserted in Count III; however, the Court declines to dismiss this count at this stage. Instead, the Court **RESERVES** judgment regarding Defendants' motion to dismiss Count III and **DIRECTS** Plaintiffs to file, within 14 days of the entry of this Memorandum Opinion and Order, an Amended Complaint setting out in greater detail the facts supporting Count III. Such Amended Complaint shall be identical to the existing Complaint in all other respects. Within 14

days of the filing of the Amended Complaint, the Court **DIRECTS** Defendants to file a Supplemental Memorandum to their Motion to Dismiss, if they wish to persist in their motion to dismiss Count III. Plaintiffs may file a Supplemental Response to such Memorandum within 7 days of Defendants' filing.

## VI. Conclusion

For the reasons stated above, the Motion to Dismiss of Defendants CMH Homes and Vanderbilt Mortgage, ECF No. 6, is **DENIED in part**, and the Court **RESERVES** judgment **in part**. Specifically, the Court **DENIES** Defendants' motion to dismiss Counts I and II, and it **RESERVES** judgment regarding Defendants' motion to dismiss Count III.

The Court **DIRECTS** Plaintiffs to file, within 14 days of the entry of this Memorandum Opinion and Order, an Amended Complaint setting out in greater detail the facts supporting Count III. Such Amended Complaint shall be identical to the existing Complaint in all other respects. Within 14 days of the filing of the Amended Complaint, the Court **DIRECTS** Defendants to file a Supplemental Memorandum to their Motion to Dismiss, if they wish to persist in their motion to dismiss Count III. Plaintiffs may file a Supplemental Response to such Memorandum within 7 days of Defendants' filing.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: May 19, 2014

ROBERT C. CHAMBERS, CHIEF JUDGE