IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
Huntington Division

WILLIAM HOWARD ADKINS and
MARRIAN A. ADKINS,

                          Plaintiffs,

v.                                                 Civil Action No. 3:13-cv-32123

CMH HOMES, INC., d/b/a
FREEDOM HOMES, VANDERBILT
MORTGAGE AND FINANCE, INC.,
And JOHN DOE HOLDER,

                          Defendants.

**PLAINTIFFS' COMBINED RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

      Defendants CMH Homes, Inc. (CMH) and Vanderbilt Mortgage and Finance, Inc. (VMF) move for summary judgment through pleadings rife with misstatements of law and the evidence. On April 11, 2009, Plaintiffs and Defendants consummated a consumer credit sale, for the sale and financing of a mobile home by Defendant CMH to the Plaintiff consumers, in which CMH extended Plaintiffs consumer credit. Although the Plaintiffs were not seeking to purchase a mobile home when they visited Defendant CMH's lot, Defendant CMH made multiple false statements to induce them into a sale and financing arrangement, including that Plaintiffs would receive financing for 30 years at 2.9% interest, but only at that time because in the future CMH would no longer offer 30 year or 20 year financing terms (if Plaintiffs did not agree to buy at that time, they would likely be forced into a loan with a 10 year term if they needed to buy a home in the future), and Defendant CMH promised that Plaintiffs' monthly payment would be less than $900. Relying on these false statements, Plaintiffs agreed to purchase and made a down payment, consummating the consumer credit sale. However, all of the representations by Defendant CMH were false.

1

Plaintiffs actually received an 8.49% financing rate, after paying over $5000 in undisclosed rate buy-down points. Their monthly payment was over $1000, and Defendant CMH still offers 30 year loan terms to this day. Because Plaintiffs have presented ample evidence in support of their claims, summary judgment must be denied.

## I. STATEMENT OF FACTS

### A. Background

Plaintiffs William Howard Adkins and Marrian A. Adkins reside in their home at Route 2, Box 609A, Tyler Creek Road, Salt Rock, West Virginia. (Wm. Adkins Dep. 12:11-12, attached as Ex. 1.) Mr. Adkins has worked in the mail room and maintenance departments of a hospital, and various warehouse jobs. He currently works at Tri-State Industrial Supply. (Id. 24-25, 33-39.) Mr. Adkins only attended high school through the eleventh grade. (Id. 22.) Mrs. Adkins has been a homemaker all her life and has never worked outside the home. She is currently unable to work due to disability. (M. Adkins. Dep. 22-23, attached as Ex. 2.) Prior to the subject transaction, Mr. Adkins had very little experience with financing transactions, and has never even had a credit card. (Wm. Adkins Dep. 69.) The only financing transaction Mr. Adkins had ever previously entered into was a land contract for the purchase of his land and an existing single-wide trailer thereon. (Id. 81.) Mr. Adkins testified that he did not understand financing transactions, testifying that he did not understand if he paid more than the required monthly payment he would pay less interest over the life of the loan. (Id. 161:3-5.) Mr. Adkins was clearly an unsophisticated consumer.[1]

### B. Consumer Credit Transaction

The Adkinses entered the land contract to purchase their land and the existing single wide

---

[1] Defendant CMH asserts Mr. Adkins, as administrator of his father's estate made certain decisions regarding the sale of his father's real property and effectuated repayment on the outstanding loan balance on said property. (Def. CMH Br. 2.) To the contrary, Mr. Adkins testified that he accepted the offered sales price only and that the buyer's attorney handled all other matters. (Wm. Adkins Dep. 26-33.)

2

trailer in 2006. (Id. 81-82.) In the spring of 2009, the Adkinses were considering options to expand their single wide. During this time, they stopped by the CMH lot in Nitro, West Virginia while out driving around. The Adkinses merely wanted to "see what they had and get ideas about what we wanted to do about add-on to the trailer." (Id. 120:9-10.)

On April 4, 2009, the Adkinses met Mr. Fry, a salesman at the CMH lot. (Id. 121.) On this visit, Mr. Adkins noticed the sign hanging from one of the trailers on the CMH lot advertising 2.9% financing. This sign was visible from the road when traveling westbound. (Id. 121:16-122:3.) The Adkinses found a model with options they liked, and inquired with Mr. Fry about the cost. At that time, Mr. Fry also told the Adkinses that CMH offered a special 2.9% financing rate if Mr. Adkins was working, which he was. (Id. 123.) The Adkinses and Mr. Fry continued to discuss the house they liked and its cost. Mr. Fry told them the home had a value of $92,000. (Id. 128.) Mr. Fry continued to mention the special financing CMH was offering, but the Adkinses still were not sure if they wanted to add on to their trailer or consider purchasing a new trailer. (Id. 127.)

Nonetheless, Mr. Fry asked them to fill out an application for a loan with the 2.9% rate, which they agreed to do.[2] Mr. Fry also confirmed again that Mr. Adkins was employed and they owned their own land. (Id. 127-128.) Mr. Fry filled out all of the loan application documents. (Id. 139.) After Mr. Fry filled out the application, the Adkinses went home, and as Mr. Adkins testified, "[w]e didn't really know if we was going to get it or not—we still didn't know exactly what we wanted to do, if we wanted to add on. I didn't even think we was going to get the loan because I mean I never had established any credit." (Id. 148:11-15.)

Nearly one week later Mr. Fry called the Adkinses to tell them they were approved for the

---

[2] Defendant CMH states it is "undisputed" that "Plaintiffs submitted the Loan Application with VMF on April 4, 2009." (Def. CMH Br. 4.) However, the testimony of the Plaintiffs and VMF's corporate representative Mr. Kirk make clear that it was CMH who submitted the application to VMF. Furthermore, it was not VMF that extended credit to the Plaintiffs. See, e.g., Affidavit of Greer, VMF Ex. A., paragraph 17.

3

2.9% financing and that they needed to come in to sign some papers. (Id. 149.) The Adkinses stopped by the CMH lot to see Mr. Fry on April 11, 2009. (Id. 149.) The Adkinses were surprised they had been approved for the special financing rate, but trusted CMH's process for financing home sales. (Id. 150.) At the lot, the Adkinses asked to go look at the home again as well as some other homes. However, Mr. Fry discouraged them from looking at lower-priced single wide trailers. (Id. 150-151.)

After they looked around, Mr. Fry continued to pressure the Adkinses to agree to purchase the doublewide. He told the Adkinses that their monthly payment would be approximately $800, and less than $900, if they agreed to purchase the home. (Id. 156.) Mr. Fry also told the Adkinses that CMH would only be offering thirty and twenty year loan terms for a limited time. Mr. Fry told them if they decided later to purchase a home, CMH would only offer a ten year term. (Id. 155.) Additionally, Mr. Fry told the Adkinses that once the new home was on their land, the land and home together would be worth $150,000 to $155,000 (Id. 171.) After making these representations to the Adkinses, Mr. Fry brought out a piece of paper for the Adkinses to sign "to lock [them] in to the double-wide." (Id. 152-153.) At that time, the Adkinses made a $250 down payment toward the purchase contract. At this point, Mr. Adkins testified, he was legally obligated to purchase the home:

> Q. Okay. Did you think you had to enter into the transaction?
> A. Yeah. Whenever he actually—when I signed the paper at Freedom Homes where he said I was locked in on the double wide, I thought from right there that I was – when I signed that paper I was legal, I mean I to – I was already signed in on it.
> Q. You thought you were legally obligated to enter into the contract at that point?
> A. Yes, sir.

(Wm. Adkins Dep. 226:1-10.)

Thereafter, Mr. Fry called the Adkinses to schedule a time to view their land. When Mr. Fry came out, he said the doublewide would have to be situated with the front door facing the side

4

dirt road, but Mr. Adkins resisted because that would mean the power lines would have to be moved which would cost the Adkinses approximately $5000.00 (Id. 166.) A day or two after Mr. Fry came out, he called the Adkinses and told Mr. Adkins that the interest rate of their financing was going to increase "almost five percent" because they wanted to face the home toward the main road. (Id. 167:18-22.)

A couple of days after that conversation, Mr. Fry called and told Mr. Adkins to contact Mr. Templeton, the vendor of the land contract under which the Adkinses were buying the land and existing home, to arrange for the closing of the financing arrangement. (Id. 168.) During this call, Mr. Fry said because of the culvert crossing their land, the Adkinses' interest rate would be increased another one percent and because of the location required for the septic, the interest rate would increase another two percent. (Id. 169.) At this point, Mr. Fry told Mr. Adkins the rate on their financing would now be 7.9%. (Id. 170:2.)

Defendant VMF's records support Mr. Adkins' testimony about the ever-changing terms of financing. As Mr. Kirk, VMF's corporate representative testified, CMH had access to VMF's internal computer software, the LINK system. (Kirk Dep. 56:20-23, attached as Ex. 3.) Mr. Kirk testified that user Fry8020, a CMH employee, made multiple changes in the internal system during the Adkinses' financing application/approval process. (Id. 57:4-13.) Mr. Kirk testified that VMF's records show Fry8020 inputted a 5.5% interest rate and a monthly payment of $843.18 dollars when submitting the application to VMF. (Id. 68-69.) Mr. Kirk testified the interest rate was then changed from 6% to 7.49% by the CMH employee Fry8020. The monthly payment had jumped to $957.46. Furthermore, at this time, Mr. Kirk testified he was unaware of how the interest rate climbed from 5.5% to 6% without any notation. (Id. 83, 84.) Mr. Kirk testified that the system

5

showed the final rate had been further increased to 9.49%.[3] (Id. 88:5-7.) Mr. Kirk further testified that none of these changes or information about the changes to the Adkinses' financing would have been communicated to the Adkinses. (Id. 73.)

Mr. Fry called the Adkinses to direct them to attend a meeting to sign the financing documents. At this time, the Adkinses were bound to purchase the mobile home for the sales price of $113,300; without financing (which had been a material term at the time of consummation of the purchase), they would have been liable for the entire balance of the contracted sales price, which all parties knew they simply could not afford. Indeed, the meeting to sign the finance documents did not provide an opportunity for the Adkinses to learn the true terms of the financing. As Mr. Adkins testified,

> "I didn't really have much of a chance to really go through everything. I was trusting Mr. Frye [sic] on everything and there was paper after paper coming and I was signing and I didn't really have a chance to go over it. I mean everything was so quick and so fast."
>
> I remember him [Mr. Metz] saying to put my initial here and that's on just about all of them, "Put your initial here, put your initial here."

(Wm. Adkins Dep. 204:1-5, 216:16-20.) Furthermore, the actual interest rate was even higher than the financing documents show. Unbeknownst to them, CMH had arranged the transaction such that the Adkinses would pay $5,239.74 in fees to purportedly lower their interest rate to the already elevated 8.49% rate. Again, the testimony is clear on this issue:

> Q. Okay. And it says "$5,239.74." Did you understand that as part of the transaction you'd be paying discount points?
> A. No, sir.
> Q. Okay. Do you know what —
> A. I don't even know what it is.
> Q. Do you know what – okay. Let me ask you: Do you know what the discount points are as you sit here today?
> A. No, sir.
> Q. Okay. Did you ever have anyone refer to buydown points?
> A. No, sir.

---

[3] Again, it is undisputed that CMH was the legal entity that extended credit to the Adkinses.

> Q. Or do you understand today what it means when someone refers to discount points?
> A. No, sir.
> Q. Was there any discussion with Mr. Frye that you recall about paying extra to lower the interest rate?
> A. No, sir.
>
> Q. But do you recall seeing a charge for over $5,000 to you?
> A. There were so many numbers, no.

(<u>Id</u>. 204:8-205:5, 221:15-17.) Even with the points the Adkinses paid, the interest rate still increased further to 8.49%. (<u>Id</u>. 214.)

Additionally, the documents the Adkinses signed that day failed to provide any meaningful disclosure of their rights or obligations. The Manufactured Home Promissory Note, Security Agreement and Disclosure Statement (the "Loan") was between the Adkinses and CMH. However, other disclosures including, the Notice of Right to Rescission, were issued to the Adkinses from VMF, who was not the lender or a creditor at that time. Indeed, the Loan only disclosed that the Loan may subsequently be assigned to VMF. (<u>See</u>, Affidavit of Greer and Exhibits 1-5, 7 thereto, VMF Ex. A.)

The above facts in support of Plaintiffs' claims also provide a complete defense to Defendant VMF's counterclaims, upon which it has contemporaneously moved for summary judgment.

## II. ARGUMENT

### A. Standard of Review

The standard for granting summary judgment is well-settled. To prevail, a movant must establish that: "(1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. In determining whether a genuine issue of material fact has been raised, we must construe all inferences in favor of the [non-moving party]." <u>Harleysville Mut. Ins. Co. v. Packer</u>, 60 F.3d 1116, 1119-20 (4th Cir. 1995) (citations omitted); <u>see also</u> <u>Henry v. Purnell</u>, 652

F.3d 524, 531 (4th Cir. 2011). "At bottom, the district court must determine whether the party opposing the motion for summary judgment has presented genuinely disputed facts which remain to be tried." Thompson Everett, Inc. v. National Cable Adver., L.P., 57 F.3d 1317, 1323 (4th Cir.1995). Because Defendants have utterly failed to meet their burden, their motions should be denied.

### B. Summary Judgment Is Not Appropriate on Plaintiff's Unconscionable Contract Claim.

1. Questions of Material Fact Preclude Summary Judgment on Plaintiff's Unconscionable Inducement Claim.

Defendants assert that the Adkinses have not presented any evidence to support their Count I for unconscionable inducement. This bald assertion is belied by the overwhelming evidence to the contrary. As set forth above, Plaintiffs clearly demonstrate their case, and at a minimum present sufficient evidence to create a question of fact on their claim.

The Adkinses brought their claim for unconscionable inducement pursuant to the West Virginia Consumer Credit Protection Act. However, Defendants misstate that a statutory unconscionable inducement claim is subject to the same standard as a common law claim for unconscionable contract.[4] Under West Virginia statutory law, a contract may be unconscionable in its terms or induced by unconscionable conduct. A consumer is entitled to relief from,

> "a consumer credit sale, consumer lease, or consumer loan, if the court as a matter of law finds: (a) the agreement or transaction to have been unconscionable at the time it was made, **or** to have been induced by unconscionable conduct.

W.Va. Code §46A-2-121(1)(a) (emphasis added). Defendants rely on the standard espoused in Brown v. Genesis Healthcare Corp., 724 S.E.2d 250 (2011), which involved a common law

---

[4] Defendants assert the standard "[u]nder West Virginia common law, [t]o be unenforceable, a contract term must-at least in some small measure-be both procedurally and substantively unconscionable." Dan Ryan Builders, Inc. v. Nelson, 737 S.E.2d 550,558 (emphasis removed). Def. CMH Br. 12. Defendants, however, do not address Plaintiffs' statutory claim for unconscionable inducement.

8

unconscionability claim challenging an arbitration clause in a nursing home intake agreement as unconscionable, rather than the statutory standard. In other recent cases, the Supreme Court of Appeals of West Virginia, has recognized unconscionable inducement as a separate cause of action pursuant to section 46A-2-121 of the West Virginia Code. See Quicken v. Brown, 737 S.E. 2d 640, 657-58 (2012) (upholding two separate claims, one for unconscionable inducement and one for unconscionable terms).

Moreover, as Justice Ketchum has explained, "the [WVCCPA] says that...a contract may be voided if it was either 'induced by unconscionable conduct' or if the terms of the contract were unconscionable at the time it was made." Credit Acceptance Corp. v. Front, 745 S.E.2d 556, 571-72 (2013) (J. Ketchum, concurring) (emphasis added); see also Diloreti v. Countrywide Home Loans, Inc., No. 5:14-cv-00076, 9-11 (N.D.W. Va. Nov. 14, 2014) (holding that the West Virginia Consumer Credit Protection Act provides for two separate claims, one for unconscionable inducement and one for unconscionable terms) (attached as Ex. 4). Accordingly, because they bring their claim for unconscionable inducement, the Adkinses need only demonstrate that the contract was unconscionably induced by Defendants' misrepresentations or suppressions.

Here, Plaintiffs have presented ample evidence to support their unconscionable inducement claim. The testimony shows that Defendant CMH, through its agent Mr. Fry induced the Adkinses to consummate the consumer credit sale by misrepresenting that the Adkinses had been approved for the special 2.9% interest rate; misrepresenting that the Adkinses' monthly payment amount would be significantly less than it is; misrepresenting the value of the Adkinses' land with the mobile home set-up thereon; and misrepresenting the future availability of thirty year loan terms. Mr. Adkins testified that they relied on these misrepresentations when they decided to enter into the agreement to buy the double wide rather than fix-up their existing home. However, even if the

9

common law standard was applied, as demonstrated above, the Adkinses have presented abundant evidence satisfying the elements of the common law claim. (See supra Part I.A, B.)

As the West Virginia Supreme Court has explained, "Courts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa." Syl. pt. 9, Brown v. Genesis Healthcare Corp., 729 S.E.2d 217 (W. Va. 2012). Courts focus on "the relative positions of the parties, the adequacy of the bargaining position, and the existence of meaningful alternatives available to the plaintiffs, and the existence of unfair terms in the contract." Quicken, 737 S.E.2d at 657 (citation omitted). "An analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole." Robinson v. Quicken Loans, Inc., 988 F.Supp.2d 615 (S.D.W. Va. Dec. 24, 2013) (quoting Pingley v. Perfection Plus Turbo-Dry, LLC, syl. pt. 6, 746 S.E.2d 544 (W. Va. 2013)). Because the nature of the inquiry is fact-intensive, summary judgment is rarely appropriate on an unconscionable contract claim. See, e.g., Herrod v. 1st Rep. Mortg. Corp., Inc., 625 S.E.2d 373, 379 (W. Va. 2005) (denying summary judgment on claim for unconscionable mortgage loan); Robinson, 988 F.Supp.2d 623, 624 (same); Knapp v. Am. Gen. Finance Inc., 111 F.Supp.2d 758, 764-65 (S.D.W. Va. 2000) (same).

The West Virginia Supreme Court of Appeals has explained procedural unconscionability as follows:

> Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract

terms; the adhesive nature of the contract; and the manner and setting in which the contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

Syl. Pt. 10, Brown, 729 S.E.2d 217. The Adkinses have presented sufficient evidence of procedural unconscionability. (See supra Part I.A, B.) First, the parties' bargaining power was grossly unequal. As described above, the Plaintiffs had very little experience with consumer credit transactions. Neither of the Plaintiffs received any education beyond high school or the GED level. Mr. Adkins worked a series of jobs as a laborer and Mrs. Adkins never worked outside the home. The inequity of the situation was exacerbated by Defendants' multiple misrepresentations during the solicitation and sale and loan origination. In addition, the contract was adhesive and designed and drafted by Defendants. Furthermore, Plaintiffs were never informed by VMF that they had been denied for financing, and were neither informed by VMF or CMH in writing that the terms of the financing had changed. Instead, any disclosures VMF provided to the Plaintiffs in April 2009 were wholly inaccurate, and the entity that actually extended credit to the Plaintiffs never provided any disclosures. Plaintiffs entered into the transaction wholly in reliance on the Defendants' misrepresentation that they had been approved for financing at 2.9% interest and a payment of approximately $800 per month. Plaintiffs were never provided alternative disclosures until the signing of the financing documents on May 19, 2009, (which were still provided by VMF) and were provided with no options regarding the financing. More importantly, **the Adkinses were already locked into the consumer credit sale—based on the Defendants' misrepresentations—by the time the financing documents were provided to them.** Further, as Mr. Adkins testified, the signing of the financing documents did not provide an opportunity to "go through everything . . . there was paper after paper coming and I was signing and I didn't really have a chance to go over it. I mean everything was so quick and so fast." (Wm. Adkins

11

Dep. 204:1-5.) This evidence is far more than necessary to demonstrate an issue of material fact regarding whether there was "a real and voluntary meeting of the minds of the parties," which must be left to the jury. See Syl. Pt. 10, Brown, 729 S.E.2d at 221.

In assessing substantive unconscionability, courts must consider:

> [W]hether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party. The factors to be weighed in assessing substantive unconscionability vary with the content of the agreement. Generally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns.

Syl. pt. 12, Id. As described in more detail above, Plaintiffs set forth evidence of substantive unconscionability. (See supra Part I.A, B.) Although the Adkinses were promised a 2.9% interest rate with a monthly payment of less than $900, the loan they got contained dramatically worse terms. The interest rate was 8.49% after the Adkinses were charged over $5000 in buy-down points to reduce the interest rate. The buy-down points were never explained to them. The monthly payment on the loan was, in actuality, over $1048 per month. In total, the Plaintiffs were charged $7,675.74 in origination and closing costs, including the undisclosed buy-down points. (See Affidavit of Greer, Ex. 1 thereto.) The financing was clearly not affordable to them, and they would have never agreed to purchase the home in the first instance if the true terms of the transaction had been disclosed at the time the sale was consummated. However, Defendants clearly benefitted by obtaining higher up-front fees as well as higher monthly interest payments. In contrast, all the risks fell on the Adkinses. Not only was the credit secured by a lien on the home sold to the Adkinses, the loan was further secured by taking a lien on the Adkinses' real property. Thus, Defendants were able to reap the immediate profit of the buy-down fee and the additional long-term profit of the higher interest payment, while the Adkins were trapped in a loan with terms significantly more disadvantageous than the terms they were promised. Clearly in light

of the sliding scale analysis, the Adkinses have presented sufficient evidence to support a common law unconscionability claim.

In response to this clear evidence supporting unconscionability, Defendants make two hollow arguments. First, Defendants assert that Plaintiffs have not established any procedural unconscionability in the transaction. In so asserting, Defendants make several factual allegations that are demonstrably in dispute. Despite the abundant record to the contrary, Defendants assert that Plaintiffs are 1) sophisticated in land transactions; 2) the loan agreement was not adhesive; 3) the manner of the closing was sufficient; and 4) the financing terms were plainly disclosed. (Def. CMH Br. 14-19.) Everyone one of these assertions is disputed and refuted by Mr. Adkins' deposition testimony and documentary evidence. Mr. Kirk's testimony further supports the Plaintiffs' testimony that the financing terms were not plainly disclosed.

First, it is preposterous to say that the Adkinses are sophisticated in land transactions. The record indicates that Mr. Adkins previously sold land on one occasion. In that transaction, Mr. Adkins did not engage in negotiations, but just accepted what he was offered for his father's farm. (See Wm. Adkins Dep. 27-28.) The only other time Mr. Adkins purchased a mobile home from a sales lot, he paid cash and did not negotiate the price. (Id. 71.) In fact, the Plaintiffs testified, that they did not have credit cards, or car loans. Furthermore, Defendants misstate Mr. Adkins testimony when they claim that he had an understanding of minimum payments and interest charges. (Def. CMH Br. 15.) As discussed above, Mr. Adkins testified he was unaware that paying more than the minimum monthly payment would result in payment of less interest over the life a loan.

Likewise, Defendants' argument that the loan agreement was fairly negotiated is inconsistent with the record. The sales and financing agreements were form contracts drafted by

13

the Defendants. To the extent that the terms were negotiated, the Plaintiffs have continually testified they had agreed to purchase the home for approximately $92,000 at 2.9% interest with a monthly payment of less than $900 per month. However, the terms of the financing Plaintiffs were induced to sign, were drastically different to Plaintiffs' detriment. Futhermore, the disclosures Defendant VMF mailed to Plaintiffs were likewise drastically different than the terms of the financing Plaintiffs were induced to sign on May 19, 2009, without ever having a chance to review the documents before the signing and well after they were already bound to the consumer credit sale. Additionally, Plaintiffs were never given appropriate notices from Defendant CMH, the entity that extended credit to them.

The Defendants' final two arguments regarding procedural unconscionability are also in dispute. Defendants argue that the manner and setting of the closing afforded the Plaintiffs an opportunity to consider and walk away from the purchase and that the loan terms were plainly disclosed and not unduly complex. (Def. CMH Br. 16-17.) This is simply not the case. First, Plaintiffs testified that they were locked into the purchase of the mobile home before the actual financing terms were disclosed to them. Second, Mr. Adkins testified that at the closing he did not have a chance to go through everything and that it was "so quick and so fast" with Mr. Metz instructing him to "put your initial here, put your initial here." (Wm. Adkins Dep. 204, 216.) Finally, Mr. Adkins testified he was unaware of the details of the transaction including the amount he paid for so-called buy-down points and the purpose of buy-down points. Clearly, Plaintiffs have raised a major issue of fact regarding whether there was "unfairness in the bargaining process." Syl. Pt. 10, Brown, 729 S.E.2d 217; Bishop v. Quicken Loans, Inc., No. 2:09-cv-1076, 2011 WL 1321360, *5 (S.D.W. Va. Apr. 4, 2011) ("Plaintiffs' borrowing history does not demonstrate indisputably that they were sophisticated consumers.").

The second argument Defendants make in support of their motion for summary judgment on Count I is that Plaintiffs have failed to show any substantive unconscionability. For this argument, Defendants rely solely on their affidavit from Jason Koontz in which he, rather irrelevantly, asserts that 8.49% interest was a competitive rate; the 30 year loan term was standard in the industry; and Plaintiffs' debt to income ratio was within industry standards. (Def. CMH Br. 13.) Mr. Koontz's observations, besides a lack of support by objective evidence and invading the province of the fact finder, fails to address the effect of the changed terms, the other alleged unconscionable terms, or the complete lack of required disclosures. Mr. Koontz does not address the impact of the buy-down points or the effective interest rate of 9.49%. Furthermore, Mr. Koontz does not address the documents supplied to the Adkinses in conjunction with this transaction and how they do not comply with federal law. The lack of compliance with federal law is evidence of the substantive unconscionability of the transaction. VMF provided all disclosures to the Adkinses, however, CMH is undisputedly the lender on the note. The record is completely void of any disclosures provided by CMH. The lender on the loan is the entity required to provide disclosures of the credit terms. (See, e.g., Reg. Z, 12 C.F.R. Part 226; Reg. X, 24 C.F.R. Part 3500; Def.'s Ex. 17.) Specifically, the lender Defendant has failed to provide initial disclosures under the Truth in Lending Act, both CMH and VMF have failed to comply with the Equal Credit Opportunity Act, and the contradictory disclosure documents substantially impair the Plaintiffs from understanding the credit transaction. (See Affidavit of Nina Simon, attached hereto as Ex. 5.[5]) In addition to terms significantly more disadvantageous than the terms to which the Adkinses assented, the lack of meaningful disclosures and failure to comply with federal law further compounded the

---

[5] Plaintiffs have engaged Ms. Simon as a consulting expert. Her affidavit here is meant solely to rebut the affidavit of Jason Koontz attached as an exhibit to Defendant CMH's brief. The Plaintiffs submit that the compliance issues here are issues of law for the Court and should not be the subject of expert testimony. Plaintiffs will submit a timely motion in limine thereon.

substantially unfair nature of the subject consumer credit sale as discussed in detail above. Because Plaintiffs have presented sufficient evidence for their claim, summary judgment should be denied.

### C. Issues of Material Fact Preclude Summary Judgment on Count II

Defendants next argue that Plaintiffs' fraud claim fails because it is untimely and not supported by the evidence. Defendants are incorrect on both questions. First, West Virginia law clearly supports Plaintiffs' ability to bring their equitable fraud claim affirmatively as a defense to the enforcement of the subject contract. In fact, the Supreme Court of Appeals of West Virginia has explained that such equitable claims must be affirmatively pleaded when a borrower faces foreclosure:

> [W]here the trust grantor wishes to challenge a foreclosure, the proper remedy is for the grantor to seek an injunction or to file an action to have the foreclosure sale set aside:
>
>> [T]he lending institutions of this state have operated under the current trustee foreclosure scheme since the founding of this state. This scheme has always permitted a grantor to seek an independent action to either prevent a real property foreclosure from taking place, or to have a real property foreclosure sale set aside.
>
> Fayette County Nat'l Bank v. Lilly, 484 S.E.2d 232, 240 (1997) (overruled on other grounds). Thus it is for a court, and not the trustee, to address objections of the grantor/homeowner to a foreclosure sale.

Lucas v. Fairbanks Capital Corp., 618 S.E.2d 488, 497-98 (W. Va. 2005). According to the West Virginia Supreme Court, in order to challenge a foreclosure sale or raise defenses to a possible foreclosure sale, West Virginia borrowers must file an affirmative action because they have no opportunity to raise those defenses in an answer or responsive pleading. In West Virginia, it is not only appropriate, but it is also necessary, for borrowers to assert claims for equitable relief in their complaints. Id.

16

Second, Plaintiffs have amply established the elements of their fraud claim.[6] Defendants argue that Plaintiffs failed to make a sufficient showing of any "fraudulent act" and Plaintiffs' reliance thereon. (Def. VMF Br. 9-10.) This argument, however, ignores the record and Mr. Adkins' extensive testimony regarding the transaction. As detailed above, Mr. Adkins testified that he and his wife were not considering buying a mobile home, and went to CMH's lot only to get ideas about what they might do to their existing home. However, at the lot, CMH's agent made numerous misrepresentations to the Adkinses, including misrepresenting the interest rate they would receive on financing, the monthly payment amount, and the future availability of long term financing. Mr. Adkins testified that he and his wife only agreed to purchase a home and made a down payment, thereby consummating the agreement between the parties, as the direct result of his reliance on Defendant's representations. This testimony is further supported by Mr. Kirk's testimony regarding the internal system which both Defendants used in procuring the Adkinses' financing and how that system, unexplainable by him, showed multiple increases in the Adkinses' interest rate after the initial transmission of information from CMH and the suppression of the same from the Adkinses. Mr. Adkins testified that he understood that he could not back out of the purchase because they had signed the purchase agreement with CMH and made their down payment.

Defendants' assertion that the transaction was not fraudulently induced because Mr. Metz says he generally explains loan documents to borrowers is a red herring. Most importantly, as explained above, the transaction was already consummated prior to the meeting with Mr. Metz, and no matter how well he purportedly explained the documents to Plaintiffs, they had no ability

---

[6] To the extent Defendants argue that VMF made no representations to Plaintiffs (or that CMH does not seek to enforce the contract against the Plaintiffs), VMF and CMH are jointly and severally liable either as joint venturers or VMF is liable for CMH's fraudulent misrepresentations as CMH's assignee.

17

to cancel the transaction at that time—which was after they had been defrauded into entering it. Further, the right to cancel was ineffective as the notice of right to cancel was provided by VMF, but the lender on the Note was CMH. (See, Greer Affidavit, Ex. 5 thereto.) Additionally, Mr. Metz had no specific memory regarding his meeting with the Adkinses. In contrast, Mr. Adkins testified clearly that he recalled the meeting and that there was not any meaningful explanation of the terms of the financing, to the extent that such an explanation could have made a difference. (See Metz. Dep, Def. CMH's Ex. D.)

Finally, Plaintiffs' equitable fraud claim is timely. The Adkinses seek only equitable relief enjoining enforcement of the contract. See, e.g., Dunn v. Rockwell, 689 S.E.2d 255, 266-67 (2009) ("Our law is clear that there is no statute of limitations for claims seeking equitable relief."). Specifically, statutes of limitations do not apply when the claims seek to rescind a deed to land or cancel a contract. Id. Thus, Plaintiffs are not barred from seeking equitable relief against their loan for this claim, and the claim survives.

Apparently recognizing that the statute of limitations does not apply here, Defendants next assert that laches bars the claim because, in their opinion, the Adkinses exercised unreasonable delay in asserting their claim. (Def. VMF Br. 15.) Because laches is an affirmative defense, Defendants bear the burden of proof. As the West Virginia Supreme Court of Appeals has explained: "Mere delay will not bar relief in equity on the ground of laches. 'Laches is a delay in the assertion of a known right which works to the disadvantage of another . . . .'" Dunn, 689 S.E.2d at 267 n.11 (citation omitted). The party asserting the defense of laches must demonstrate its own detrimental change in position as the result of the delay. Id.

Despite its burden, Defendants only present a general argument that it has been prejudiced because Plaintiffs' memories of the transaction have faded. However, it is not clear how

18

Defendants believe Plaintiffs' lapses in memory prejudice it, and the Defendants do not present any evidence in support of its claim. To the contrary, Mr. Adkins demonstrated specific recollection of the facts surrounding Plaintiffs' claims; any documents pertaining to the transaction should be in Defendants' possession; and Defendants have deposed both Plaintiffs as well as the attorney who conducted the signing of the financing documents. Defendants make a wholly unsupported assertion that they are prejudiced. However, what is clear is that Plaintiffs continue to suffer the prejudice of the consumer credit transaction. The contract between the parties is still in effect, Plaintiffs continue to be damaged by Defendants' fraudulent misrepresentations. Indeed, Defendant VMF has brought counter-claims in which they seek to foreclose on Plaintiffs' home and recover monetary damages. These counter-claims arise from the contract at issue in Plaintiffs' equitable fraud claim. Accordingly, because the Plaintiffs' fraud claim simply seeks equitable relief against the loan, which Defendant VMF seeks to enforce in this litigation, no statute of limitations applies, and Defendants have not articulated any specific prejudice, summary judgment is inappropriate.

### D. Issues of Material Fact Preclude Summary Judgment on Count III.

Plaintiff's Count III asserts that Defendants are jointly and severally liable because CMH and VMF were joint venturers.[7] Defendants do not dispute the validity of Plaintiffs' claim, only that if the other counts are dismissed, Plaintiffs' joint venture claim should be dismissed as well. As stated above, there is ample evidence to support Plaintiffs' other counts and, accordingly, the motion to dismiss Plaintiffs' Count III must also be denied.[8]

---

[7] Again, as an alternative theory for joint liability, VMF is liable for wrongs committed by CMH as an assignee. W. Va. Code §§ 46A-2-101, -102

[8] Additionally, Plaintiffs have demonstrated sufficient facts supporting their joint venture claim. Under West Virginia law, A joint venture . . . is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties. The contract may be oral or written, express or implied. See Bowers v. Wurzburg, 528 S.E.2d 475, 484 (W. Va. 1999) (citing cases); see also Short v. Wells Fargo Bank Minn., N.A., 401 F. Supp. 2d

### E. Summary Judgment is Not Appropriate on VMF's Counter-Claims

VMF has moved for summary judgment on its counter-claims against Plaintiffs for breach of contract, judicial foreclosure, and unjust enrichment. As a matter of law, Plaintiffs' claims against Defendants provide a complete defense against VMF's counter-claims, because they assert that the contract is unenforceable and void. Because Plaintiffs have presented enough evidence to survive summary judgment on their claims against Defendants, which provide a complete defense to VMF's counter-claims, VMF's motion for summary judgment on its counter-claims must be denied.

### III. CONCLUSION

In sum, Defendants CMH Homes, Inc. and Vanderbilt Mortgage and Finance, Inc. have failed to establish that they are entitled to judgment as a matter of law. As a result, the motions for summary judgment should be denied.

> Plaintiffs,
> **WILLIAM HOWARD ADKINS
> and MARRIAN A. ADKINS,
> By Counsel,**

/s/ Colten L. Fleu
Colten L. Fleu (State Bar ID 12079)
MOUNTAIN STATE JUSTICE, INC.
321 West Main Street, Suite 401
Clarksburg, WV 26301
(304) 326-0188
(304) 326-0189 (fax)

---

549, 563 (S.D. W. Va. 2005). Here, CMH and VMF used the same computer system, both with equal access. Mr. Kirk testified that CMH's employee changed financing terms in this internal system. Furthermore, when VMF initially denied Plaintiffs for financing, VMF only sent communications to CMH; nothing was sent to the Plaintiffs. (See, e.g. Kirk Dep. 56-57, 73.) Further, CMH conducted certain tasks to enable the origination of the loan, such as soliciting the borrower, collecting documentation, while VMF completed other tasks, such as underwriting and funding the loan; in other words, Defendants combined their skill and knowledge to originate the loan. (Id.) Finally, profits were shared between Defendants. VMF received a larger profit from the increased interest rate, and immediately pocketed the proceeds of the buy-down points. (Kirk Dep. 24, 45.) Defendant CMH made "somewhere in the $23,000 to $24,000" range on the sale of the home. (Gunnell Dep. 31, attached as Exhibit .)