IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

WILLIAM HOWARD ADKINS and
MARRIAN A. ADKINS,

                    Plaintiffs,

v.                                              CIVIL ACTION NO.   3:13-32123

CMH HOMES INC. d/b/a FREEDOM HOMES,
VANDERBILT MORTGAGE AND FINANCE, INC.,
and JOHN DOE HOLDER,

                    Defendants.

### MEMORANDUM OPINION AND ORDER

Pending before the Court are Defendant CMH Homes, Inc.'s Motion for Summary Judgment (ECF No. 98), Defendant Vanderbilt Mortgage and Finance, Inc.'s Motion for Summary Judgment (ECF No. 100), and Defendant Vanderbilt Mortgage and Finance, Inc.'s Motion for Summary Judgment on Counterclaims (ECF No. 102).  For the following reasons, Defendants' motions for summary judgment are **DENIED** and Defendant Vanderbilt Mortgage and Finance, Inc.'s motion for summary judgment on counterclaims is **DENIED**.

## I.      FACTUAL BACKGROUND

In November 2013, Plaintiffs William Howard Adkins and Marrian A. Adkins filed the instant action in the Circuit Court of Cabell County, West Virginia, against Defendants CMH Homes, Inc., doing business as Freedom Homes, ("CMH Homes"), Vanderbilt Mortgage and Finance ("Vanderbilt Mortgage"), and John Doe Holder, regarding the purchase, financing, and warranty of a mobile home that they bought from CMH Homes in 2009.  According to the Amended Complaint, CMH Homes sold the mobile home to Plaintiffs, Vanderbilt Mortgage

services the loan which resulted from the sale,[1] and John Doe Holder is the as-yet unidentified holder of the note for that loan. *See* Amd. Compl. ¶¶ 3–5, ECF No. 17. Against these Defendants, Plaintiffs raise three counts in the Amended Complaint: (1) unconscionable inducement of the Loan Agreement; (2) fraud as a contract defense; and (3) joint venture. Amd. Compl., ¶¶ 27–44, ECF No. 17.   Defendant Vanderbilt Mortgage counterclaims: (1) breach of contract; (2) judicial foreclosure; and (3) unjust enrichment. Answer, ¶¶1–22, ECF No. 22.   In order to consider the parties' claims, the Court will first summarize the relevant factual background, including (a) Plaintiffs' education and experience, (b) Plaintiffs' selection of a CMH Homes manufactured home and initial financing discussions, (c) the loan closing process, and (d) Plaintiffs' payment record after closing.

### A.  Plaintiffs' Backgrounds and Education

Defendants maintain that Plaintiffs are sufficiently sophisticated consumers, yet Mr. and Ms. Adkins's educational and employment histories do not suggest significant exposure to real estate, finance, or secured transactions.  Ms. Adkins graduated from high school, but has never worked outside the home. Marrian Adkins Dep. 22–23, Sept. 15, 2014.  Mr. Adkins attended high school through the eleventh grade, but he did not graduate from high school, instead earning a G.E.D. in 1996. William Adkins Dep. 22, Sept. 10, 2014.  Over the years, Mr. Adkins has worked in the mail room and maintenance department of a hospital, as a grounds person at a state park, and at various warehouses—never having significant responsibility for purchasing or recordkeeping. *Id.* at 24–25, 33–39.  Presently, Mr. Adkins works at Tri-State Industrial Supply. *Id.* at 38.

In addition to being without significant educational or employment background that would have aided the Adkins in the extant transaction, Mr. Adkins had only limited personal experience

---

[1] The Complaint also asserts that Vanderbilt Mortgage is the "assignee" of CMH Homes, but given the addition of John Doe Holder as a defendant in this case, any role of Vanderbilt Mortgage beyond servicing Plaintiffs' loan is unclear. *See* Compl. ¶ 4.

with financing.   Mr. Adkins has never had a credit card. W. Adkins Dep. 69.   Mr. Adkins has never financed the purchase of a vehicle. *Id.*   Mr. Adkins previously purchased a mobile home, but he made that purchase with a one-time cash payment, paying the asking price in full without negotiation. *Id.*

Indeed, it appears that, apart from the transaction at issue here, Mr. Adkins previously financed just one other purchase: the land where Plaintiffs now reside and the mobile home already attached at the time of purchase. *Id.* at 81.   In 2006, Plaintiffs purchased the property where they currently live through a land contract drafted by the seller's attorney. *Id.* at 81–83. There was no formal appraisal or inspection of the property prior to purchase. *Id.*   Plaintiffs agreed to pay $38,000 ($2,000 below the seller's asking price), making a $10,000 down payment and financing the remainder through the seller. *Id.* at 81–82.   The seller estimated monthly payments of $300 to $400 per month over ten years, but Mr. Adkins "told [the seller] that [he] would go ahead and pay $1,000 a month to go ahead and get it paid off and [the seller] was for that." *Id.* at 83.   Mr. Adkins did not do any research at the time to investigate whether the offered 7.5% interest rate under the agreement was reasonable. *Id.* at 84–85.

Though Defendants suggest that Plaintiffs were sufficiently sophisticated and educated customers, deposition testimony is equivocal on that question.   As the exchange below demonstrates, though Mr. Adkins previously did purposefully make accelerated payments on his land contract, it is not necessarily certain that he understood then or understands now the general benefits of paying down financed principle sooner rather than later:

> Q:   Or making, say, instead of [payments] once a month, twice a month?
>
> W. Adkins:   I remember I think he said something about where our payments would be—or that—I can't remember if it was four weeks, instead of being a whole month, it was like four weeks or something like that, where we ended up I think it was paying like three extra payments a year.

-3-

| | |
|---|---|
| Q: | Okay. |
| W. Adkins: | But I don't remember how that worked out, but he said that there was some way of doing it where we ended up paying instead of 12 payments, it would be like 15 payments. |
| Q: | Okay. And did you understand that to be beneficial to you? |
| W. Adkins: | No. |
| Q: | Why not? |
| W. Adkins: | I mean it seemed like that was more money coming out.  I know that instead of 12 payments, that would be 15 payments. |
| Q: | Well, did you understand though that you'd pay off the loan sooner if you did it that way? |
| W. Adkins: | But the payments was a lot higher. |
| Q: | Did you understand you'd pay less interest if you paid it that way? |
| W. Adkins: | We did not know. |

W. Adkins Dep. 161.

**B.  Selection and Financing of a CMH Home**

On April 4, 2009, Plaintiffs visited the sales lot of CMH Homes. W.Adkins Dep. 120. Plaintiffs were beginning to explore options for adding on to their existing single-wide trailer. *Id.* Upon finding a trailer that they liked and noticing an advertisement visible from the road for 2.9% financing, Plaintiffs started a conversation with David Fry—an agent of CMH Homes—to ask about costs and financing. *Id.* at 124–26.   Though Plaintiffs apparently explained that they were still not sure about whether they wanted to add on to their single wide trailer or to purchase something new, Mr. Fry had them fill out some paperwork to run a credit check for possible financing. *Id.* at 126.   At that time, Mr. Fry suggested the total cost for purchase and setup would be about $92,000. *Id.* at 128.   Mr. Adkins understood that figure to represent a "ballpark estimate" and that Mr. Fry could have "come back later with changes to that price." *Id.* at 129.

After that initial interaction with Mr. Fry, Plaintiffs did not seek out any alternative financing sources. W. Adkins Dep. 148.   As explained by Mr. Adkins:

> We didn't really know if we was going to get it or not, and we wasn't—we still didn't know exactly what we wanted to do, if we was wanting to add on. I didn't even think we was going to get a loan because I mean I never had established any credit.

*Id.*

According to Mr. Adkins, it was Mr. Fry that suggested refinancing Plaintiffs' existing land contract with the purchase of a new home. W.Adkins Dep. 127.   In response to hearing that the Adkins made $1,000 monthly payments, Mr. Adkins recalls that Mr. Fry offered that he thought he could get Mr. Adkins "a deal." *Id.*; see also *id.* at 147 (recalling that Mr. Fry told Mr. Adkins that he would "see what [Defendants] could do for [them]" with respect to including the existing land contract).

A few days after submitting a loan application to Mr. Fry, Plaintiff was informed that the application had been approved. *Id.* at 149-50.   Surprised by the news of approval, Plaintiffs asked to take another look at the mobile home. *Id.* at 150.   On this second look, Mr. Fry accompanied Plaintiffs into the home, and to Mr. Adkin's recollection, Mr. Fry then "asked [Plaintiffs] how [they] feel being in [their] new home," but Plaintiffs "still couldn't believe that [they were] going to be able to get it." *Id.*

Before returning to the office, Plaintiffs asked to look at some of the other homes on the sales lot. *Id.*   According to Mr. Adkins, when Plaintiffs began looking at the single-wides, Mr. Fry explained that Plaintiffs were approved for the double-wide they had previously expressed an interest in. *Id.*   Mr. Adkins further reports that Mr. Fry "wasn't very happy" about Plaintiffs looking at the single-wide homes, though Mr. Adkins did not appear to be similarly unhappy about Plaintiffs looking at more expensive double-wide options. *Id.* at 151.   Upon returning to the office, Mr. Fry had Plaintiffs sign a paper; afterwards, Mr. Adkins claims that Mr. Fry explained that the signed paper "was to lock [Plaintiffs] in to the double-wide . . . and that [approval] wasn't

for no other trailer."[2] *Id.*   According to Mr. Adkins, so far as he understood, signing that paper made him legally obligated to purchase the home. *Id.* at 226–227.

In beginning to determine terms, Mr. Fry later told the Plaintiffs that they could arrange a 20- or 30-year loan instead of a 10-year loan in order to reduce monthly payment amounts. *Id.* at 155.   As remembered by Mr. Adkins, Mr. Fry represented that these longer-term loans would only be available for a limited time, and that come the end of that year, only 10-year loans would be available. *Id.*   Assuming a longer-term loan, Mr. Fry allegedly estimated that monthly payments would be about $800 - $900, based on a 2.9% interest rate. *Id.* at 156, 158.   Mr. Fry further allegedly estimated that, once installed, Plaintiffs' land and the new home would be worth $150,000 to $155,000. *Id.* at 171.   Mr. Adkins further recalls Mr. Fry suggesting that "after a year [Plaintiffs] could go to about any bank and refinance [the home and land]."[3] *Id.*   Purportedly relying on the terms and representations made by Mr. Fry in the course of the Adkins' visits to the CMH Homes sales lot, Mr. Adkins wrote a $250 check as a deposit for purchase, intending to secure his right to purchase the home at the stated terms. *Id.* at 171–174.

Whatever the reason, the terms as allegedly initially discussed are not the terms that were ultimately agreed to.   The first changes apparently coincided with Mr. Fry's visit to Plaintiffs' property and his determination that the new home would have to be installed facing Cemetery Road rather than facing Tyler Creek. *Id.* at 166.   To Mr. Adkins' recollection, Mr. Fry explained

---

[2] S*ee also id.* at 152 (explaining that Mr. Adkins remembered that Mr. Fry "said that is was where we was approved for the double-wide that we was looking at, and it was for that one and that one only, to lock us in on that one, and that that was the one that we was qualified for"); *id.* at 153 (explaining that Mr. Adkins believed that the form was to "lock in on" a particular double-wide trailer, securing Plaintiffs' right to buy that particular trailer at terms previously discussed).

[3] Mr. Adkins indeed attempted to make refinancing arrangements in April 2012 when he was struggling to make his payments after being laid off. W. Adkins Depo. 252–55, ECF No. 115-1. Mr. Adkins made refinancing inquiries with three banks and each one told him that they categorically did not finance mobile homes. *Id.*

that the type of loan necessitated that the front of the home face the driveway. *Id.* at 167.   Given

the allegedly necessary orientation of the new home, power lines would have to be relocated at an

added expense of roughly $5,000. *Id.* at 166.   Approximately two days later, Mr. Fry called and

relayed to Mr. Adkins that instead orienting the home to face Tyler Creek would mean they were

no longer eligible for the special 2.9% financing and that the interest rate would now be almost

5%. *Id.* at 167–68.   While Mr. Adkins was "shocked" and "ticked off" by this news, he did not

discuss it with anyone but his wife. *Id.* at 168.

Mr. Fry called two more times with additional changes.   First, Mr. Fry allegedly called to

explain that because a permit would be required to go over the water line on the property the

interest rate would need to go up another percentage point. *Id.* at 168–69.   Next, Mr. Fry allegedly

called within a couple days of closing to explain that given the location of the septic tank, the

interest rate would need to go up yet another two percentage points. *Id.* at 169.   The interest rate

thusly inched from an initial 2.9% up to 7.9%.

Mr. Adkins' recollection of the changing interest term is independently supported by

Vanderbilt Mortgage records.   Jeffrey Kirk, a zone originations manager with Vanderbilt

Mortgage, explained in deposition that CMH Homes and Vanderbilt Mortgage employees enjoy

access to the same software: the LINK system. Jeffrey Kirk Dep. 56, Sept. 12, 2014.

Notwithstanding the fact that CMH Homes sales lot employees did not control the rates offered on

Vanderbilt Mortgage loans, Mr. Kirk further explained that a CMH Homes employee with user

name "Fry8020" made a number of changes to Plaintiffs' loan materials in the LINK system. *Id.* at

57.   Though interest rates are ordinarily calculated upon submission to Vanderbilt Mortgage,

according to Mr. Kirk's reading of the system audit log, user Fry8020 made a manual entry

applying a 5.5% interest rate, thereby auto-generating a payment amount of $843.18 *before*

submitting the loan application to Vanderbilt Mortgage.[4] *Id.* at 68–69.   During the course of being considered by Vanderbilt Mortgage, Plaintiffs' application was declined at least once, though Plaintiffs apparently received no notification of that decision. *Id.* at 73.   Later, the interest rate in the LINK system changed to 6%, but Mr. Kirk was unable to identify how or why that occurred based on the audit logs. *Id.* at 82.   Though the change to 6% remains unexplained, the audit log reveals that user Fry8020 then changed the interest rate to 7.59% and the monthly payment to $957.46. *Id.* at 83. Further changes by user Fry8020 resulted in a 9.49% interest rate. *Id.* at 86–89.

Ultimately, Plaintiffs entered into a loan agreement with an unpaid principal balance of $136,498.21, accruing interest at an annual rate of 8.49% and requiring Plaintiffs to make 360 payments of $1,048.59. Loan Agreement, ECF No. 98-2 at 7-10.   Of note, the principle amount owed under the Loan Agreement included $116,469 for the purchase of the mobile home, $12,353.47 to pay-off Plaintiffs' existing land contract, and $5,239.74 for discount points to reduce the effective interest rate. *Id.*   The total principle and interest scheduled to be paid over the life of the loan amounts to $377, 492.40.[5] *Id.*

At the time of purchase, Mr. Adkins's gross income was approximately $2,066 per month and Ms. Adkins was receiving approximately $885 per month in disability assistance, resulting in gross household income of approximately $2,951. Loan Application, ECF No. 98-2 at 4.   Based

---

[4] Manual assignment of an interest rate by a CMH Homes sales employee is in contrast to the ordinary process wherein "[t]he system pulls the credit bureau, runs it through [Vanderbilt Mortgage's] internal scoring system, assigns a score, and then looks at downpayment percentage, what type of house it is, multi-sectional or single-section, and then wherever that falls on [Vanderbilt Mortgage's] rate chart, puts that number in." Kirk Dep. 65–66.

[5] The total finance charge under the loan agreement is $246,498.93 and the principle amount financed is $130,993.47. Loan Agreement, ECF No. 98-2 at 7-10.

on that reported income, payments required under the Loan Agreement amounted to roughly 35.5% of the Plaintiffs' gross income.[6]

### C.  The Closing Process

The closing process was handled by an attorney, George Metz, and lasted approximately an hour to an hour and a half on May 19, 2009. W.Adkins Dep. 202.   During that time, Mr. Metz presented the following closing documents to the Plaintiffs: (1) the loan agreement; (2) the sales agreement; (3) the Retailer Closing Agreement; (4) a payment coupon; (5) a closing statement; (6) the Discount or Buydown Points Disclosure statement; (7) an affiliated business arrangement disclosure statement; (8) a closing notice; and (9) the Deed of Trust for the loan transaction.   In addition to presenting the closing documents, Mr. Metz is further in the practice of making the following initial statement during a closing:

> This is an important transaction, the single most important transaction that most people will ever undertake. If you are not comfortable being here for any reason whatsoever, you're free to leave at any time. I tell everyone: I do not want you to do something you're not comfortable doing. If you're not comfortable, you're free to leave.

G. Metz Dep. 24–25, Oct. 29, 2014.   To Mr. Metz's recollection, he did not "deviate in any manner from the normal protocols and practices with respect to real estate closing involving manufactured housing when [he] closed the deal involving the Adkinses." *Id.* at 89.

Perhaps not surprisingly given the number of documents, Mr. Adkins does not remember there having been time for detailed review and explanation:

> I didn't really have much of a chance to really go through everything. I was trusting Mr. Fry on everything and there was paper after paper coming and I was signing and I didn't have really a chance to go over it.   I mean everything was so quick and so fast.

---

[6] This 35.5% debt obligation would not include Plaintiffs' obligations to maintain property damage insurance, pay taxes on the property, or pay other recurring housing-related expenses.

I remember him [Mr. Metz] saying to put my initial here and that's on just about all of them, "Put your initial here, put your initial here."

W. Adkins Dep. 204, 206.   That said, Mr. Adkins was also certainly not compelled to sign any documents or otherwise prevented from raising questions he may have had at the time:

> Q:   At any point did you ask to have a document explained to you during closing?
>
> W. Adkins:   No, sir.
>
> Q:   Okay. At any point did you try to ask a question and someone refused to answer your question?
>
> W. Adkins:   No, sir.
>
> Q:   Okay. At any point did someone say to you that you could not review the documents?
>
> W. Adkins:   No, sir.

*Id.* at 204.

Though Mr. Adkins did not use the closing process as an opportunity to raise questions, his deposition makes it clear that he did not fully understand all of the closing documents that were presented and signed.   For instance, though he received a disclosure statement related to buydown points, Mr. Adkins claims to have had no knowledge then and no knowledge now to even explain what buydown points are:

> Q:   Okay. And it says "$5,239.74." Did you understand that as part of the transaction you'd be paying discount points?
>
> W. Adkins:   No, sir.
>
> Q:   Okay. Do you know what
>
> W. Adkins:   I don't even know what it is.
>
> Q:   Do you know what – okay. Let me ask you: Do you know what the discount points are as you sit here today?
>
> W. Adkins:   No, sir.
>
> Q:   Okay. Did you ever have anyone refer to buydown points?
>
> W. Adkins:   No, sir.
>
> Q:   Or do you understand today what it means when someone

-10-

|  | refers to discount points? |
| W. Adkins: | No, sir. |
| Q: | Was there any discussion with Mr. Fry that you recall about paying extra to lower the interest rate? |
| W. Adkins: | No, sir. |
| Q: | But do you recall seeing a charge for over $5,000 to you? |
| W. Adkins: | There were so many numbers, no. |

*Id.* at 204–05, 221.  Moreover, Mr. Adkins's continuing apparent lack of familiarity with buydown points is particularly curious given the signed disclosure form which provides, in relevant part, that the over $5,000 of financed buydown points "are not required by Seller or Vanderbilt, but have been requested by Buyer to be included in the transaction in order to reduce the interest rate approved by Vanderbilt from 9.49% per annum to 8.49% per annum . . .." Buydown Disclosure Statement, ECF No. 100-1 at 10.

Though not congruent with earlier deposition testimony, Mr. Adkins did testify to understanding that he was not required at closing to enter into the loan agreement:

| Q: | Okay. But you understood at that time that you didn't have to sign this document, isn't that right? |
| W. Adkins: | Correct. |
| Q: | Okay. So you could have gotten up from the table, walked away and said, "I don't want to enter into this agreement," correct? |
| W. Adkins: | Correct. |
| Q: | Okay. But you chose to enter into it anyway, isn't that correct? |
| W. Adkins: | Correct. |

W. Adkins Dep. 214.

The provided one-page closing notice states that, having reviewed Plaintiffs' "credit history, current and expected income, current obligations, employment status and financial resources other than the equity (if any) in the residence which will secure your financing,"

-11-

Vanderbilt Mortgage "has come to the good faith belief that you (and any Co-Signer) have the capability of repaying this financing." Closing Notice, Ex. 3 of Affidavit of K. Greer, ECF No. 100-1 at 11.   Purportedly by signing, Plaintiffs confirmed that they "have the ability to repay this financing according to its terms, including the payment of taxes and property damage insurance." *Id.*

The provided one-page Right of Rescission explained that Plaintiffs had a right to cancel the transaction "without any penalty or obligation within three (3) business days* from" May 19, 2009. Notice of Right of Rescission, Ex. 5 of Affidavit of K. Greer, ECF No. 100-1 at 25.   As explained in deposition by the closing attorney, Mr. Metz:

> [The Right of Rescission] gives you three more days. Not only do you spend two hours in my office, you get copies of everything that you have signed, and then you're sent home with a packet of stuff and have three days to look at is. If you have questions, you can call me or call the sales center, call your lawyer, call whomever you wish.

G. Metz Dep., at 38, ECF No. 100-5.

### D.  After Closing

After taking possession of their new manufactured home, the Adkinses made on-time payments from September 2009 through November 2012. Adkins Acct. Doc., Ex. 12 of Affidavit of K. Greer, ECF No. 100-1.   After Mr. Adkins was laid off at the end of 2012, however, Plaintiffs made two late, partial payments in January 2013. *Id.*; W. Adkins Dep. 249–50, ECF No. 115-1. On January 28, 2013, Vanderbilt Mortgage enrolled Plaintiffs in a payment assistance program. Vanderbilt Mortgage Letter, Ex. 13 of Affidavit of K. Greer, ECF No. 100-1.   Under the payment assistance program, Vanderbilt Mortgage was to pay one-half of the monthly payment due for February, March, and April 2013, leaving Plaintiffs to pay the remaining half of each of those three monthly payments. *Id.*   When this temporary assistance ended, Plaintiffs were immediately

-12-

again late on their full monthly payment just as they had been in January. Adkins Acct. Doc., Ex. 12 of Affidavit of K. Greer, ECF No. 100-1.   On May 30, 2013, Plaintiffs made an on-time, full monthly payment, but have not done so since. *Id.*   Plaintiffs continued to fall further behind in their payments as they made only sporadic, partial payments thereafter. *Id.*

On November 12, 2013, Vanderbilt Mortgage sent a Notice of Default demanding that Plaintiffs cure the default by making a payment of $3,122.97, no later than December 12, 2013. Notice of Default Ltr., Ex. 11 of Affidavit of K. Greer, ECF No. 100-1 at 35.   Should Plaintiffs fail to cure the default by that date, the notice further warned that the loan obligations could be accelerated and the property could be repossessed and sold. *Id.*   Plaintiffs did not make further payments by December 12, 2013 as demanded. *See* Adkins Acct. Doc., Ex. 12 of Affidavit of K. Greer, ECF No. 100-1.

Both CMH Homes and Vanderbilt Mortgage now move the Court for summary judgment on Plaintiffs' claims, and Vanderbilt Mortgage also moves the Court for summary judgment on its counterclaims.   After introducing the applicable standard of review in Section II, the Court will examine Plaintiffs' claims in Section III and Vanderbilt Mortgage's counterclaims in Section IV.

## II.    STANDARD OF REVIEW

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).   In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).   Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

### III.   PLAINTIFFS' CLAIMS

In the Amended Complaint, Plaintiffs raise the following three causes of action: (1) unconscionable inducement of the Loan Agreement; (2) fraud as a contract defense; and (3) joint venture. Amd. Compl., ¶¶ 27–44, ECF No. 17. The court will consider whether Defendants have met their burden in moving for summary judgment with respect to each claim, in turn.

#### A.  Unconscionable Inducement

The West Virginia Consumer Credit and Protection Act ("WVCCPA") sets out a cause of action for unconscionability or inducement by unconscionable conduct. W.Va. Code § 46A-2-121. The statute provides that:

> (1) With respect to a transaction which is or gives rise to a consumer credit sale, consumer lease or consumer loan, if the court as a matter of law finds:
>
> > (a) The agreement or transaction to have been unconscionable at the time it was made, or to have been induced by unconscionable conduct, the court may refuse to enforce the agreement, or
> >
> > (b) Any term or part of the agreement or transaction to have been unconscionable at the time it was made, the court may refuse to enforce the agreement, or may enforce the remainder of the agreement without the unconscionable term or part, or may so

-14-

> limit the application of any unconscionable term or part as to avoid any
> unconscionable result.

*Id.*

As explained by the West Virginia Supreme Court of Appeals, "[t]he doctrine of unconscionability means that, because of an overall and gross imbalance, one-sidedness or lop-sidedness in a contract, a court may be justified in refusing to enforce the contract as written." Syl. Pt. 12, *Brown ex rel. Brown v. Genesis Healthcare Corp.*, 724 S.E.2d 250, 261 (2011) ("*Brown I*"). "If a court, as a matter of law, finds a contract or any clause of a contract to be unconscionable, the court may refuse to enforce the contract, enforce the remainder of the contract without the unconscionable clause, or limit the application of any unconscionable clause to avoid any unconscionable result." Syl. Pt. 16, *Brown I*, 724 S.E.2d at 261.

"An analysis of whether a contract term is unconscionable necessarily involves an inquiry into the circumstances surrounding the execution of the contract and the fairness of the contract as a whole." Syl. Pt. 3, *Troy Mining Corp. v. Itmann Coal Co.*, 346 S.E.2d 749 (W.Va. 1986). Thus, "[t]he concept of unconscionability must be applied in a flexible manner, taking into consideration all of the facts and circumstances of a particular case." *Id.* "A determination of unconscionability must focus on the relative positions of the parties, the adequacy of the bargaining position, the meaningful alternatives available to the plaintiff, and the existence of unfair terms in the contract." Syl. Pt. 4, *Art's Flower Shop, Inc. v. Chesapeake and Potomac Telephone Co. of West Virginia, Inc.*, 413 S.E.2d 670 (W.Va. 1991). "The particular facts involved in each case are of utmost importance since certain conduct, contracts or contractual provisions may be unconscionable in some situations but not in others." Syl. Pt. 2, *Orlando v. Finance One of West Virginia, Inc.*, 346 S.E.2d 749 (W.Va. 1988).

Arguably, under West Virginia law, a contract is only unconscionable if both procedural and substantive unconscionability are present to some degree. *State ex rel. Johnson Controls. Inc. v. Tucker*, 729 S.E.2d 808, 817 (W.Va. 2012).   Procedural unconscionability refers to inequity during the bargaining process and substantive unconscionability refers to the unfairness of a specific contract term. *See id.* Though both are required, they need not be equally represented. "Courts should apply a 'sliding scale' in making this determination: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the clause is unenforceable, and vice versa." *Brown v. Genesis Healthcare Corp.*, 729 S.E.2d 217, 227 (W.Va. 2012) ("*Brown II*").

Plaintiff argues that a stand-alone claim for unconscionable inducement exists without regard for substantive unconscionability.   Indeed, as noted by Justice Ketchum, "the [WVCCPA] says that . . . a contract may be voided if it was either 'induced by unconscionable conduct' or if the terms of the contract were unconscionable 'at the time it was made.'" *See Credit Acceptance Corp. v. Front*, 745 S.E.2d 556, 533–34 (W.Va. 2013) (Ketchum, J., concurring).   Such an interpretation is consistent with a plain reading of the statute, as observed Chief Judge Bailey in *Diloreti et al v. Countrywide et al*, No. 5:14-cv-00076, 9 – 11 (N.D. W.Va. Nov. 14, 2014).

Though Defendants disagree, Plaintiffs along with at least one federal district court have read the West Virginia Supreme Court of Appeal's decision in *Quicken Loans, Inc. v. Brown*, 737 S.E.2d 640, 657 (W.Va. 2012) to establish the viability of a stand-alone unconscionable inducement claim.   In *Quicken Loans*, the West Virginia Supreme Court of Appeals upheld findings of unconscionable inducement where defendant's conduct included "[t]he false promise of refinancing; [i]ntroducing a balloon payment feature at closing; [f]ailing to properly disclose the balloon payment; [f]alsely representing that the plaintiffs were buying the interest rate down; and

-16-

[n]egligently conducting the appraisal review and failing to realize the highly inflated appraisal from Guida[.]" 737 S.E.2d at 657.   As noted by Defendants, however, the court's analysis of unconscionable inducement was but one portion of its analysis of unconscionability under § 46A-2-121, which also included allegations that the loan at issue included several unconscionable terms and was itself unconscionable. *Id.* at 656–59.

In further support of Plaintiffs' argument for a stand-alone unconscionable inducement claim, Plaintiff has provided notice of legislative consideration of the relevant statute. ECF No. 142.   Senate Bill 542 proposed revisions to § 46A-2-121, striking "or" in favor of using "and" to connect subsections (1)(a) and (1)(b). *See* Pl.'s Ex. A, ECF No. 142-1 at 2.   Upon passing out of the Committee on the Judiciary, however, that amendment had been removed from the proposed bill, thereby leaving § 46A-2-121 unchanged. *See* Pl.'s Ex. B, ECF No. 142-1 at 16.   According to Plaintiffs, the proposed amendment's death in committee makes it "clear the legislature intends for West Virginia consumers to have a cause of action for unconscionable inducement *or* unconscionable terms under W.V. Code § 46A-2-121." ECF No. 142.   Contrary to Plaintiffs' suggested interpretation, however, the Court recognizes that proposed amendments may die in committee for any number of reasons, among them, a desire not to disturb existing court interpretations of the statutory language.

In short, the Court remains unconvinced that a claim for unconscionable inducement is subject to a more limited analysis than an unconscionability claim otherwise would be. Regardless, as discussed below, Plaintiffs have provided sufficient evidence to survive summary judgment even tested against the general requirements under the doctrine of unconscionability.

    *1.  Substantive Unconscionability*

"Substantive unconscionability involves unfairness in the contract itself and whether a contract term is one-sided and will have an overly harsh effect on the disadvantaged party." Syl. Pt. 12, *Brown II*, 729 S.E.2d at 221 (citation omitted).   Though the relevant factors may vary, "[g]enerally, courts should consider the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and public policy concerns." *Id.*

Defendants have offered the affidavit of Mr. Jason D. Koontz, a purported industry expert, in support of the contention that none of the terms in the loan agreement were substantively unconscionable. Aff. of J. Koontz, ECF No. 98-7.   Indeed, Mr. Koontz goes so far as to say that the interest rate of 8.49% was a competitive rate for financing a mobile home purchase at the time and a 30-year term was industry standard at the time.[7] *Id.*   Mr. Koontz further opines that Plaintiffs' "debt to income ratio of 36.36% under the executed promissory note and loan agreement was within industry guidelines." *Id.*

Like Defendants, Plaintiffs also offer expert opinions, but those opinions reach the opposite conclusion: explaining that myriad aspects of the loan agreement were inconsistent with industry norms as codified by federal and state laws. *Id.*   Taking just one example, Plaintiffs' expert, Nina Simone, explains that the notices received by Plaintiffs related to the transaction failed to comply with the Truth in Lending Act ("TILA").   Though CMH Homes initially held the loan, Vanderbilt Mortgage provided an Estimated TILA disclosure projecting "a 25-year loan with a monthly payment of $883.13 for 300 months, a total sales price of $265,164 and an APR of

---

[7]   Mr. Koontz offers no comment on the fact that plaintiffs paid over $5,000 in buydown points to reach the 8.49% interest rate; indeed, on the face of the affidavit it is not even clear that Mr. Koontz was aware of the buydown points.   Similarly, Mr. Koontz does not mention whether there had been any reason to suspect that 30-year loans would not have continued to be available after 2009, thereby leaving the alleged statements of the sort by Mr. Fry unsupported.

6.62%. *Id.* at 7 (citing Initial TILA, VMF 0000032).   In contrast, the final terms of the loan entered into with Freedom "added 5 years or 60 additional payments to the loan term, increased each of those monthly payments by $165.46 . . . increased the total sales price by over $112,000 to $377,742.40 and the APR by 2.32 to 8.94%." *Id.* (citing Final TILA, Note p.1, CMH/Adkins 000005).

The substantive changes in the terms of the loan are so great as to suggest unconscionability.   Comparing the noticed terms of the loan to the actual terms of the loan, a reasonable juror could conclude that the terms ultimately had an overly harsh effect on Plaintiffs. In addition to Ms. Simone's declaration, the Court observes that the final terms of the loan even more dramatically depart from the advertised rate of 2.9%, which presumably reflected competitive available financing at the time.   Of course, it is also important to remember that these dramatic shifts in financing terms existed despite the purchase and financing of buydown points, a feature of the loan agreement left unaddressed by experts on both sides.   Looking to these facts, while not deciding the truth of the matter, the Court is satisfied that Plaintiffs have offered some evidence supporting a finding of substantive unconscionability, and thereby preventing summary judgment. *Id.*

### 2. *Procedural Unconscionability*

With respect to procedural unconscionability, the West Virginia Supreme Court of Appeals has explained that:

> Procedural unconscionability is concerned with inequities, improprieties, or unfairness in the bargaining process and formation of the contract. Procedural unconscionability involves a variety of inadequacies that results in the lack of a real and voluntary meeting of the minds of the parties, considering all the circumstances surrounding the transaction. These inadequacies include, but are not limited to, the age, literacy, or lack of sophistication of a party; hidden or unduly complex contract terms; the adhesive nature of the contract; and the manner and setting in which the

contract was formed, including whether each party had a reasonable opportunity to understand the terms of the contract.

Syl. Pt. 10, *Brown II*, 729 S.E.2d at 221 (citing Syl. Pt. 17, *Brown I*, 724 S.E.2d at 261).

Defendant CMH Homes compares the Plaintiffs' level of education and experience with like transactions to that of the plaintiffs in *Kucharek v. Dan Ryan Builders, Inc.*, 2013 WL 3365249 (N.D. W.Va. July 3, 2013), and while there are admitted similarities, there are also striking differences.  Like the plaintiffs in *Kucharek*, between them, the Adkinses hold a high school diploma and a GED. *Id.* at *10.  While Mr. Adkins worked principally in maintenance positions throughout his career, the two plaintiffs in *Kucharek* worked in data processing and as an auto mechanic. *Id.*  And that may well be the end of the similarities between the two sets of plaintiffs.

Though not highlighted in Defendant's briefing, there are several meaningful differences readily noted between the plaintiffs in *Kucharek* and Plaintiffs here.  Before considering factual distinctions, one situational difference is especially worth noting as it arguably renders the entire comparison analytically inapposite: the plaintiffs in *Kucharek* did not finance their purchase, instead paying the over $350,000 purchase price outright.  The court's analysis therefore did not focus on sophistication in the context of financing agreements, but rather in the context of an arbitration-related unconscionability claim.  That fundamental contextual difference arguably renders the *Kucharek* court's analysis wholly irrelevant to assessing the Adkinses' sophistication.

With that fundamental contextual difference in mind, the Court turns to factual distinctions similarly overlooked by Defendant.  First, in *Kucharek*, the transaction at issue was the purchase of a newly constructed home for over $350,000 (negotiated down from $377,000), a far cry from the financed purchase of a manufactured home for around $100,000 at issue here. *Id.* at *2. Second, Mr. Kucharek had purchased a total of eight homes in his lifetime, including a previous

purchase of a newly constructed home, but Mr. Adkins had only previously purchased one manufactured home and had only previously financed one major real estate purchase. *Id.* at *3. Third, Mr. Kucharek was regarded by the court as a "saavy consumer," known to investigate, research, and "shop around for the best price to make sure he is not being overcharged." *Id.* at *11. Mr. Adkins, in contrast, apparently did not "shop around" at all, for the purchase of the manufactured home itself or for the financing arrangements enabling that purchase.[8]  It was not only based on the *Kucharek* plaintiffs' education and experience as retold by Defendants, but also on these additional factors that the court was able to conclude that the *Kucharek* plaintiffs "were educated consumers with high school degrees and experience in the home-buying process." *Id.* However, given the many and substantial differences, the Court cannot conclude that comparison to the *Kucharek* plaintiffs is at all beneficial to this analysis, except to say that the Adkinses were relatively less sophisticated and experienced, and yet entered into a considerably more complex and burdensome contractual agreement.

Defendants further point to Plaintiffs' decision to make $1,000 payments on their land contract as evidence of their financial sophistication.   However, based on review of Mr. Adkins's testimony, the Court is not convinced that decision showed anything more than his desire not to be burdened with a debt obligation any longer than needed, without necessarily understanding the resulting effects on interest accrued under the loan. *See e.g.*, W. Adkins Dep., 83, ECF No. 115-1.

Plaintiffs' relative lack of sophistication rendered them uniquely ill-prepared to question that process, and arguably renders the loan process in this case particularly egregious.   For instance, it appears that the Adkinses accepted limited and dubious explanations for changes in the financing terms explained by Mr. Fry without objection.   The Court remains skeptical as to

---

[8] The same can be said of Mr. Adkins's previous major purchases as he appears to have repeatedly paid asking price and accepted terms as offered.

whether, in fact, there was a legitimate connection between the available interest rate and the orientation of the home relative to the driveway, the location of a water line, or the location of the septic tank.[9]   Regardless of whether these explanations are ultimately revealed to be legitimate or pretextual, the Court finds no justification in the record whatsoever explaining why a CMH Homes sales employee would manually make changes to the interest rate—actions decidedly outside the role and authority of CMH Homes employees.

In addition to the questionable conduct by a CMH Homes employee, inadequacies in the loan process related to Vanderbilt Mortgage's conduct similarly suggest some degree of procedural unconscionability.   First, the Court finds no evidence in the record that the Adkinses were provided notice of initial rejection by Vanderbilt Mortgage, as required under federal law.[10] Second, as argued by Plaintiffs, the Notice of Rescission provided by Vanderbilt Mortgage may have been illusory insofar as it could relieve Plaintiffs of financing obligations, but would not be effective to relieve Plaintiffs of the obligation to purchase the home from CMH Homes.   Finally, though Defendants stress that the "perfect" closing had the effect of absolving any wrongful conduct, in making that argument Defendants forget the gravamen of Plaintiffs' allegations. Lacking independent understanding, Plaintiffs relied on Mr. Fry to fix the terms of the deal.   As

---

[9] Mr. Kirk explained that changes in the loan program could have been necessitated by requirements that there be "no existing structures on the property, the home had to face the main street, you know, it had to look very similar to a site-built home, it had to look like the rest of the area; those type things." Kirk Dep. 41:21–25.   A reasonable juror could readily conclude that this explanation is incongruous with the explanations relayed by Mr. Fry.   Furthermore, a review of the audit log revealed manual changes to the interest rate made by CMH Homes employee "Fry8020" which were unrelated to any loan program changes and were made without providing any explanatory notations.

[10] Testimony from Mr. Kirk ultimately leaves it unclear whether the audit logs reflected a final denial or indicated that Vanderbilt Mortgage needed CMH Homes employees to request additional information from Plaintiffs.   If the former, as stated, there is no evidence that Plaintiffs received notice of denial, and if the latter, there is no evidence that Mr. Fry or another CMH Homes employee ever solicited additional information from Plaintiffs.

explained by Mr. Adkins, that reliance continued through to the point of closing, and such reliance could reasonably explain why Plaintiffs went through with the closing and did not attempt to exercise the right of rescission.

In sum, the court finds that, for purposes of summary judgment, Plaintiffs have produced some evidence enabling a finder of fact to determine that their relative unsophistication contrasted with the undeniably confusing nature of the transaction at issue and alleged course of dealing with CMH Homes and Vanderbilt Mortgage resulted in procedural unconscionability.  Coupled with substantive unconscionability, held even to the most rigorous interpretation of the law, Plaintiffs have provided sufficient evidence to survive summary judgment with respect to their unconscionable inducement claim.

### B.  Fraud as a Contract Defense

By an affirmative claim of fraud, Plaintiffs seek equitable relief enjoining enforcement of the contract.   In moving for summary judgment, Defendants argue through Vanderbilt Mortgage that (1) Plaintiffs have failed to satisfy the elements of fraud, (2) Plaintiffs' fraud claim is time barred, and (3) Plaintiffs' fraud claim is barred by the doctrine of laches.[11]

#### 1.  *Elements of Plaintiff's Fraud Claim*

---

[11] Defendant CMH Homes raises an additional ground for summary judgment on Plaintiffs' fraud claim.   Though only Vanderbilt Mortgage is seeking to enforce the contract, Plaintiffs bring their fraud claim against both Vanderbilt Mortgage and CMH Homes.   Because CMH Homes is not seeking to enforce the contract, it argues entitlement to summary judgment as a matter of law. Plaintiffs respond that "Vanderbilt Mortgage and CMH are jointly and severally liable either as joint venturers or Vanderbilt Mortgage is liable for CMH's fraudulent misrepresentations as CMH's assignee." ECF No. 115 at 17, n.6.   As will be more fully set out below, whether Vanderbilt Mortgage and CMH Homes were engaged in a joint venture will require the finder of fact to resolve contested issues of material fact.   Accordingly, summary judgment on the claim is not appropriate on the basis of the current record.   Instead the Court will turn immediately to consideration of whether Plaintiffs have provided sufficient evidence to sustain their claim of fraud as a contract defense.

Under West Virginia law, a claim of fraudulent inducement of a contract requires a showing that "the allegedly fraudulent act was committed by the defendant; the act was material and false; the plaintiff justifiably relied upon the act; and the plaintiff was damaged because he relied upon it." *White v. Nat'l Steel Corp.*, 938 F.2d 474, 490 (4th Cir. 1991) (citing *Lengyel v. Lint*, 280 S.E.2d 66, 69 (W.Va. 1981).   "An action for fraud may lie where the defendant either knows the statement to be false, makes the statement without knowledge as to its truth or falsity, or makes it under circumstances such that he should have known of its falsity." *Lengyel*, 280 S.E.2d at 69.   While a plaintiff must show reliance upon the allegedly false representations, "[i]t is not necessary that the fraudulent representations complained of should be the sole consideration or inducement moving the plaintiff. If the representations contributed to the formation of the conclusion in the plaintiff's mind, that is enough . . .." *Id.* (quoting Syl. Pt. 3, *Horton v. Tyree*, 139 S.E. 737 (1927)).

Here, alleged conduct by Mr. Fry satisfies Plaintiffs' burden on summary judgment to present some evidence of a fraudulent act.   As alleged by Mr. Adkins, Mr. Fry made several arguably fraudulent assertions directly to Plaintiffs.   As discussed above, it remains unsettled whether the reasons for interest rate changes to the interest rate terms asserted by Mr. Fry were pretextual or legitimate.   In addition to Mr. Adkins's recounting of Mr. Fry's assertions, Mr. Kirk offered testimony on behalf of Vanderbilt Mortgage that CMH Homes employees would not have been responsible for setting the interest rate in the LINK system, and yet CMH Homes employee "Fry8020" repeatedly made manual adjustments to the interest rate on Plaintiffs' loan.   Taken in the light most favorable to Plaintiffs as the nonmovants, it could reasonably be concluded that Mr. Fry's conduct included at least one—and possibly several—falsehoods, made under circumstances such that Mr. Fry would have known of the falsity.   Fraudulent adjustments to the interest rate

-24-

resulted in material changes to the terms of the loan, namely increased burden undertaken by Plaintiffs and increased benefits accruing to Defendants.   Over the life of the loan, the difference between the interest rate as initially offered and the interest rate at closing resulted in over $100,000 of additional interest charged to Plaintiffs.   Finally, Mr. Adkins's deposition testimony suggests reliance on the representations of Mr. Fry to Plaintiffs' detriment.   Though Defendants challenge the reasonableness of such reliance, given the relative unsophistication and inexperience of Plaintiffs, such reliance was not only reasonable, but also foreseeable.   Thus, examining the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have offered sufficient evidence to establish the elements of fraud.

2.   *Timeliness of Plaintiff's Fraud Claim*

In addition to challenging the substantive sufficiency of Plaintiffs' fraud claim, Defendants further argue that the claim is barred by the statute of limitations.   The Court finds, however, that Plaintiffs' equitable claim for fraud as a contract defense is timely.   Under West Virginia law, a borrower facing foreclosure may affirmatively plead equitable claims to prevent or set aside a real property foreclosure. *Lucas v. Fairbanks Capital Corp.*, 618 S.E.2d 488, 498 (W.Va. 2005). Furthermore, West Virginia law makes it "clear that there is no statute of limitations for claims seeking equitable relief." *Dunn v. Rockwell*, 689 S.E.2d 255, 266 (W.Va. 2009).   Because Plaintiffs have brought an equitable claim of fraud as a contract defense against imminent real property foreclosure, Plaintiffs' claim is not subject to a statute of limitations.

3.   *Doctrine of Laches*

Not categorically barred by the statute of limitations, Defendants next argue that Plaintiffs' fraud as a contract defense claim should be barred by the doctrine of laches.   "Mere delay will not bar relief in equity on the ground of laches. 'Laches is a delay in the assertion of a known right

which works to the disadvantage of another, or such delay as will warrant the presumption that the party has waived his right.'" Syl. Pt. 2, *Bank of Marlinton v. McLaughlin*, 123 W.Va. 608 (1941) (quoted by *Dunn*, 689 S.E.2d at 267, n.11).   The West Virginia Supreme Court of Appeals has further "consistently emphasized the necessity of a showing that there has been a detrimental change of position in order to prove laches." *Maynard v. Board of Educ. of Wayne County*, 357 S.E.2d 246, 253 (1987) (quoted by *Dunn*, 689 S.E.2d at 267, n.11).   As an affirmative defense, Defendants bear the burden of proof.

Here, however, Defendants have not specifically articulated any detrimental change of position apart from gaps in Mr. Adkins's memory.   Defendants otherwise characterize Mr. Adkins's testimony as self-serving and unreliable, so the Court is strained to imagine how the mere absence of more testimony by Mr. Adkins creates such a disadvantage to Defendants as to warrant laches.   Defendants are still perfectly able to offer evidence of loan documents and disclosures sent to Plaintiffs in addition to testimony from persons involved in the loan transaction, for instance, Mr. Metz.   Finding no detrimental change of Defendants' position, the Court declines to apply the doctrine of laches.

### C.  Joint Venture

The West Virginia Supreme Court of Appeals has defined "joint venture" as "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. It arises out of a contractual relationship between the parties.  The contract may be oral or written, express or implied." *Bowers v. Wurzburg*, 528 S.E.2d 475, 484 (W.Va. 1999).   "Whether a relation of joint venture exists is primarily a question of fact for the trial court to determine from the facts and the inferences to be drawn therefrom." *Rhodes v. Sunshine Mining Co.*, 742 P.2d 417 (1987).

Here, Plaintiffs have presented some evidence that could support an ultimate finding that CMH Homes and Vanderbilt Mortgage were engaged in a joint venture.   It appears that CMH Homes submitted a loan application exclusively to Vanderbilt Mortgage, and that in that submission, a CMH Homes employee overstepped the scope of his employment at the sales lot by manually entering an initial interest rate on that loan application.   Manual entry was systemically possible owing to shared access to the LINK system used by CMH Homes and Vanderbilt Homes to respectively submit and review credit applications from sales lots.   Moreover, it also appears that Vanderbilt Mortgage did not communicate directly with Plaintiffs throughout the process, apparently instead principally communicating via CMH Homes employees as intermediaries.   As alleged by Plaintiffs, it would have been while acting as an intermediary for Vanderbilt Mortgage that a CMH Homes employee made fraudulent representations to Plaintiffs.   Like access to the LINK system, this communication structure appears to have been by design and not at all accidental.   Accordingly, viewed in the light most favorable to Plaintiffs, though contested, there is sufficient evidence in the record to reasonably support a conclusion that CMH Homes and Vanderbilt Mortgage were engaged in a joint venture, and summary judgment on the issue is not presently appropriate.

## IV.    VANDERBILT MORTGAGE COUNTERCLAIMS

Defendant Vanderbilt Mortgage raised the following three counterclaims: (1) breach of contract; (2) judicial foreclosure; and (3) unjust enrichment. Answer, ¶¶1–22, ECF No. 22.   As discussed above, whether a valid contract to purchase a home from CMH Homes with financing from Vanderbilt Mortgage exists is contested and material issues of fact remain precluding summary judgment on Plaintiffs' claims.   Because the Court cannot determine the viability of

Vanderbilt Mortgage's counterclaims until resolving whether a valid and enforceable contract exists, summary judgment on Vanderbilt Mortgage's counter-claims is presently inappropriate.

## V.   CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant CMH Homes, Inc.'s Motion for Summary Judgment (ECF No. 98), **DENIES** Defendant Vanderbilt Mortgage's Motion for Summary Judgment (ECF No. 100), and **DENIES** Defendant Vanderbilt Mortgage's Motion for Summary Judgment on Counterclaims (ECF No. 102).

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        April 14, 2015

ROBERT C. CHAMBERS, CHIEF JUDGE